SANDY HITES COMPANY, Plaintiff-Appellant, v. STATE HIGHWAY COMMISSION, Defendant-Appellant.—149 S. W. (2d) 828.

Division One, April 18, 1941.

*Sebree, Sebree & Shook* and *David R. Hardy* for plaintiff-appellant.

956

*Bradshaw & Fields, Louis V. Stigall* and *Ralph M. Eubanks* for defendant-appellant.

HYDE, C.—This is an action in four counts seeking to recover the value of additional thickness of concrete pavement, over the amount paid for by the State, on four sections of State highway work. On Count 1 (for $5376.17 on Section E) and Count 2 (for $6232.79 on Section F), the jury found for defendant; on Count 3 (on Section G), the jury found for plaintiff for $4120.62; and on Count 4 (on Section H) the jury found for plaintiff for $2491.95. Both parties have appealed from the judgment entered.

The work was done under a written contract with written plans and specifications, awarded on bids received after public notice in accordance with Section 8116, R. S. 1929 (10 Mo. Stat. Ann., 6900). Plaintiff concedes that it has been paid all amounts due it under the contract. "Plaintiff's action is for damages for breach of the implied warranty of sufficiency of the plans and specifications furnished by the Highway Commission." The assignments of error (and points and authorities) in the briefs go to the question of whether or not such an action may be maintained under the circumstances of this case.

Plaintiff's contract provided that it should construct a concrete pavement 20 feet wide, which would be 9 inches thick at the edges

(for two feet towards the center) and 7 inches thick over the rest of its dimensions. All sand and gravel was furnished by the State. Plaintiff was to be paid a fixed price (the amount of his bid) per square yard of pavement constructed. The specifications fixed the elevations of the grade on which the pavement should be constructed.

The contract contained (our italics) the following provisions:

"Subgrade Preparation. 1-59. Description. That portion of the graded roadbed upon which surfacing is to be placed is hereby designated as the subgrade. The subgrade shall be constructed so that it will be uniform in density throughout its entire width and will *conform to the line, grade and cross-section shown on the plans* or as established by the Engineer. . . .

"1-60C. Rollers . . .

"The roller used in preparing the subgrade for a Portland cement concrete base course or pavement shall be a well-propelled light roller weighing not more than five (5) tons which will insure a uniform compaction of the subgrade and *will eliminate clods and loose material.*

"*Where hauling results in forming ruts* or other objectionable irregularities, *the Contractor shall reshape and re-roll the subgrade* before the surfacing is placed.

"1-60D. Finishing. After the subgrade for concrete pavement has been compacted *it shall be brought to true shape by the use of an approved subgrade machine,* and after rolling it shall be *tested by means of a template riding on the side forms ahead of the mixer.* Such template shall be furnished by the Contractor and must have a continuous edge, must be of rigid construction, and must be built to conform to the cross-section shown on the plans. Scratch templates with spikes or teeth will not be permitted. *If the subgrade is not to the proper elevation, material shall be added or removed as required,* and if material is added it shall be satisfactorily incorporated and compacted. The process of adding or removing material, compacting and testing shall be repeated until all irregularities are removed. Extreme care shall be taken in forming the crown and shaping the subgrade so as *to be sure that when the pavement is finally finished the specified thickness of concrete is obtained.*

"Immediately before the concrete is placed, the true subgrade shall be prepared by means of an approved template or subgrade planer rolling on the forms behind the mixer. The planer shall be capable of being *adjusted so as to give the subgrade the exact elevation and cross section at all times.* On those areas of the subgrade found to be too high, *planing or excavating shall be done until the required depth is reached,* and the surplus material shall be deposited on the shoulder. Those *areas found to be below the true subgrade elevation shall be filled with concrete as an integral part of the slab proper.* . . .

"Portland Cement Concrete Pavement. . . .

"15-5. Side Forms. Forms shall be made of steel, of an approved section, with a base width of at lease eight (8) inches, and *the height shall be equal to the thickness of the pavement* at the edge.

"B. Setting Forms. The forms shall be set so that they rest firmly throughout their entire length upon the thoroughly compacted subgrade. *Any subgrade which is more than one-half (½) inch below the established grade at the form line shall be brought to grade* for a sufficient width, outside the area required by the pavement, to support the forms adequately, and shall be thoroughly rolled as specified in Section 1-62A. All subgrade for forms shall be prepared by a form grader of a type approved by the Engineer. If the finished grade after cutting with a form grader is *more than one-half (½) inch low, it shall be refilled, rerolled,* and again cut to the required grade. This operation shall be repeated until a satisfactory foundation for the forms is obtained. *Any variations which are less than one-half (½) inch low and all variations which are above grade, shall be brought to true grade.* . . .

"Compensation. 15-22. Method of Measurement. *Pavement shall be constructed to the dimensions shown on the plans.*

"The thickness of pavement, except pavement resurfacing, shall be determined from the lengths of cores taken from the pavement, or from lengths of cores and corresponding external edge measurements. . . .

"Due to the fact that sections of *pavement deficient in thickness by more than one-half (½) inch will be removed,* all cores or edge measurements shorter than the specified thickness by more than one-half (½) inch shall not be considered in determining the average thickness of pavement. . . .

"15-23. Basis of Payment. If the average thickness of any one thousand (1,000) foot section of pavement, as determined by Section 15-22, *is less than the thickness shown on the plans by one-half (½) inch or less, the unit price used in payment thereof shall bear the same ratio to the contract unit price as the square of the average thickness of the pavement as actually built bears to the square of the thickness of the pavement* specified on the plans.

"The Contractor's unit contract price for Portland cement concrete pavement *will be considered as full compensation for all materials and other items entered into the construction* of the pavement, and *no additional compensation will be allowed for any excess thickness.*

"If cement and/or *aggregates are furnished by the Commission, the Contractor shall be charged with all materials used in extra thickness of any section* which is in excess of the specified thickness as indicated by actual core lengths and edge measurements. Quantities of materials used in such extra thickness shall be derived from cubic

yards of concrete, using the same factors as used during construction of the work.''

Plaintiff's contract covered 18 miles of concrete highway on Highway No. 35 (from Highway No. 71 east to the Henry County line) in Cass County. The work was divided into four sections of about 4½ miles each. In the fall of 1936, plaintiff commenced work on Section F and paved east through Section E to Highway 71, completing this half of the work before closing down for the winter. The weather conditions were good and the ground was dry most of the fall. In the spring of 1937, plaintiff commenced work on Section G and paved west through Section H to the Henry County line completing the work. There was about three weeks of bad weather in the spring. It was determined that there was overthickness of the pavement on each section for which deduction was made, from the contract settlement, for value of State furnished sand and gravel used therein, which was as follows: Section E. .326 inch- $1717.73; Section F .392 inch- $1992.80; Section G .265 inch- $1598.83; Section H .145 inch- $839.95. Plaintiff seeks to recover these amounts withheld by the State and also the value of the overthick (over 7 inches) pavement for which it was paid nothing. Plaintiff concedes that it is not entitled to this under the contract and that it has been paid all that the contract provided it should be paid. Plaintiff's proposition is that ''The Highway Commission is legally responsible for the excess thickness of pavement because it furnished the plans and specifications which the plaintiff faithfully followed in completing the pavement; for when so furnished by the contractee and faithfully followed by the contractor, there is an implied warranty of the sufficiency of such plans and specifications for the purpose and the owner is obliged to accept and pay for the result, whatever it may be.'' Defendant claimed that the overthickness was due to improper preparation of the subgrade (earth foundation of the pavement) leaving holes and ruts in it. There was much conflicting evidence on this issue. However, because of the view we take, we will accept plaintiff's version of the facts.

Plaintiff set up its plant and machinery in September, 1936. Its superintendent on the job was L. E. Shafer. Its foreman was Clyde Burris. The project engineer for the State Highway Commission was E. E. Thornburg. The slab inspector was O. A. Lotspeich. The work of the project engineer was to set the grade and line stakes, and this he usually did some distance in advance of the paving machinery. The work of the slab inspector and his assistant was to see that the pavement was constructed according to plans and specifications. It is customary for the slab inspector to furnish the contractor with a calculation of the theoretical ordinates, and that was done in this case. The theoretical ordinates represent the depth from a plane between the tops of the side forms, below which the pave-

ment is to be constructed. (Otherwise stated "the measurements of the State to which the slab was to be constructed.") Before the employees of the Hites Company set its grading machinery, Mr. Lotspeich handed to Mr. Burris the theoretical ordinates on Section F, and suggested that Burris and Shafer set the subgrading machinery one-fourth of an inch below these specified settings. He told them it was customarily done in order to insure full 7 inch thickness. Burris, Shafer, Lotspeich and Redman agreed that the subgrading machinery should be set one-eighth of an inch below the theoretical ordinates. The machinery was so set and work was begun on Section F. Plaintiff paved for about a half mile and finding the lineal feet of pavement running short per batch, raised the settings one-eighth of an inch, that is, up to the settings prescribed by the specifications, and completed Section F and all of Section E with the subgrading machinery set as specified. (Lotspeich claimed that no such change was made during the fall work.) When the work was begun in the spring on Sections G and H, the machinery was set on the theoretical ordinates or "on the money," because the report showing overthickness on the first two sections had been received. After paving about one mile, the setting was raised 1/8th inch to 1/8th above the theoretical ordinates. When the highway engineers learned this, they ordered paving stopped until the setting was lowered to the theoretical ordinates.

The manner in which the work of paving was done was first, to scarify an old oiled surface roadbed; then, the trench in which the pavement was to be laid was roughed out with the road plows and grading machinery. Then the roadway was graded for the steel side forms. When the forms were set, a subgrading machine was operated, running on wheels on these side forms as a track, and throwing dirt on the shoulders of the roadway. This subgrading machine brought the subgrade to an approximation of the required depth, and the roadway was rolled as required by the specifications with a five-ton roller. Plaintiff operated its concrete mixing machine between the forms upon caterpillar treads. This was a large and heavy machine. Materials were brought to this mixing machine by trucks which traveled over the graded roadbed and crossed over the subgrading machine by tracks, which made a bridge over it. The trucks frequently made ruts and holes in the subgrade. These were filled with earth and tamped before the pavement was laid. Behind the mixing machine, and attached to it, there was a subgrade planer and check template, which moved, through attachments to the mixer, when the mixer moved. The subgrade planer behind the mixing machine did the final cutting of the subgrade. The check template, back of it, did no cutting. It was constructed in accordance with the grade as shown by the plans and specifications, and ran on the side forms. "The purpose of the check template is to check the depth of the subgrade.

. . . When the grade was high the wheels would get up and ride up off the forms. When the grade was low, you could see it was low beneath the blade.'' The mixing machine delivered and mixed concrete along a large steel boom by means of a bucket which contained a heavy amount of concrete, which dropped with much force upon the subgrade. After the concrete was deposited on the subgrade, it was worked into place and brought to surface through a concrete finishing machine. This finishing machine has two surfaces that bear upon or push the concrete, known as screeds, the front screed and the back screed. The concrete has a tendency to surge up behind these screeds as they pass over it.

Plaintiff claims that it was not allowed to use its own judgment and its own methods to get pavement which would be seven inches thick, but that it had to work on the setting of its machinery required by the State. As to the effect of this plaintiff's superintendent said:

"Our forms are the controlling factor for thickness, if the material was dry, or not very workable or plastic. It (the pavement) could be thick on account of the settlement, because as the forms went down, with relation to your finished surface, it would have the same effect as raising your subgrade. . . . If the subgrade is smoothly prepared, and no depressions, and if your template is set on the money, at 7 inches, at that time, and if your forms do not sink, if the screed on the finishing machine was set to the elevation determined by the engineers, if all those things were assumed, there would still be no way of determining what we would get, whether we would get thin pavement, or thick pavement, or correct pavement. You could determine the thickness within half an inch but I would doubt if it could be determined within a quarter of an inch. The setting of the subgrade machine by the Highway Department is what I say caused the over-thick pavement. . . . If you go down hill, pouring concrete down hill, the concrete is naturally moist and it flows, that would tend to make the concrete thinner. But if you go up hill, naturally the concrete would run back, and that would make it thicker. . . . A contractor would fill the depressions with earth, and tamp it, instead of putting in the expensive concrete. During a period of excessive rainfall and subgrade becomes soft, and the trucks cause ruts. The contractor pays for filling up the holes and not the State. . . . Now, you could build the surface exactly to the cross-section shown on the plans, you could drag your trail grader all through the subgrade exactly to the cross-section shown on the plans, dump the concrete on it, and you can't tell exactly what it will be after it is dumped on it. The plans specify a certain thickness of pavement, but the specifications go further and say that our subgrade machine should be set so as to cut the subgrade a certain depth. When you cut the subgrade to that depth, that doesn't insure your thickness of pavement. . . . It doesn't insure the results specified because

there are so many variables. The quality of the material and the workability would have some effect on this. The State furnished the sand and gravel on this work and we furnished the cement and mixed it. The variation in the material is under the control of the State Highway Department because they determine the amount of water we use in the concrete, the workability and plasticity of the concrete. . . . The third variable is dumping this heavy weight of concrete; to a certain degree, when this weight of concrete hits the soil, it is bound to displace the soil, possibly right where the force of it would strike it there would be a depression, or low place. . . . We were powerless to change our settings to conform to the weather.''

The reason for control of the setting of the machinery, according to defendant's inspector, was as follows:

''You can't dig a trench 6-7/8 inches deep and put 7 inches of concrete in it. . . . We don't know exactly what thickness of pavement, if it is exactly on the money, but we do know that if we have it less than 7 inches we are not going to get an average of 7 inches. (Also the project engineer said.) After you have brought the subgrade to the elevation specified in the plans, and after you bring the top of the pavement to the elevation specified in the plans, you will not consistently get seven inches of pavement, but it will average seven inches.''

Plaintiff, quoting from an annotation in 88 A. L. R. 797, l. c. 798, says the applicable rule of law is as follows:

''The rule has become well settled, in practically every American jurisdiction in which the matter has been involved, that a construction contractor who has followed plans and specifications furnished by the contractee, his architect or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results—at least after the work is completed —*solely from the defective or insufficient plans or specifications,* in the absence of any negligence on the contractor's part, or any express warranty by him as to their being sufficient or free from defects.'' (Our italics.)

Plaintiff cites cases holding that a contractor should be paid for his work, or extra work of reconstruction, where a bridge fell because the plans were fundamentally defective (Penn Bridge Co. v. City of New Orleans, 222 Fed. 737); where part of a building fell because of defects in plans and specifications (Bently v. State, 73 Wis. 416, 41 N. W. 338); where a reservoir leaked because plans were insufficient to make it watertight (Filbert v. City of Philadelphia, 181 Pa. 530, 37 Atl. 545); where a ship built according to plans did not conform to the standards of the American Bureau of Shipping (Louisiana Shipbuilding Co. v. Bing (La.), 104 So. 364); and where a pipe line, because of deficiencies in the plans, would not carry the intended steam pressure. [State of Nebraska v. Commercial Casualty

Co. (Neb.), 248 N. W. 807.] Plaintiff also cites United States v. Spearin, 248 U. S. 132, 39 Sup. Ct. 59, 63 L. Ed. 166, where a United States government contract, for building a dry dock, required the building or relocation of a large sewer before the dry dock work could be done. The sewer work was performed according to plans and specifications but the sewer was insufficient because of an obstruction in another sewer with which it connected. It was held that the responsibility for failure was on the government, because "the insertion of the articles prescribing the character, dimensions, and location of the sewer imported a warranty that if the specifications were complied with, the sewer would be adequate;" and that "this implied warranty is not overcome by the general clauses requiring the contractor to examine the site," etc. All of these cases, and many others cited, are cases where, although the structure was insufficient, the contractor nevertheless had *built the structure he contracted to build,* and he was not to be denied compensation because it was insufficient for the other party's purpose, when such insufficiency was due to such other party's fault. When the contract is to build a specified structure, according to another's plans, of course, the contractor does not insure that such plans and specifications are sufficient to obtain the result sought, and he should be paid if he did what he agreed to do.

▉ This is not a case of an insufficient structure. On the contrary, it was somewhat better than was required by the plans and specifications. The question here is whether the contractor should be paid for the excess thickness which made the pavement slightly better than the plans and specifications required. Plaintiff says that it should be entitled to recover the cost of this extra thickness (not under the contract which specifically provided that "no additional compensation will be allowed for any excess thickness") but as damages on a cause of action arising "by virtue of the defendant's breach of the implied warranty of the sufficiency of the plans and specifications, furnished by defendant, to accomplish the result specified and required by the contract," namely—pavement seven inches thick.

Therefore, the decisive issue is: Can there be any such implied warranty under the circumstances of this case and under the terms of the contract involved? We think not, because the reasonable construction of this contract appears to us to be that it plainly provides that there should not be. In other words, it clearly means that its specifications will not necessarily produce exactly seven inches of thickness under actual conditions of construction. Instead, it leaves it to the contractor to prepare a subgrade that will hold the thickness to seven inches or to fill any additional space with concrete at his cost. Not only does it state that "no additional compensation will be allowed for any excess thickness" but also says that, when the grading is completed, "those areas found to be below the true subgrade elevation shall be filled with concrete as an integral part of the

slab proper.'' Moreover, it said that pavement was to be accepted "less than the thickness shown on the plans by one-half inch or less," and paid for proportionately; and that the contractor's unit price per square was to be "considered as full compensation for all materials and other items entering into the construction of the pavement." Considering all of these provisions and construing the contract as a whole, we think its clear intent was that the contractor should provide a subgrade that would conform to and hold the required elevation (and not be or sink below it) or provide at his own cost the concrete to fill any low or sunken space. We think the situation is well illustrated by Beattie Mfg. Co. v. Heinz, 120 Mo. App. 465, 97 S. W. 188, also cited by plaintiff, where an exhibition booth built according to plans and specifications would not fit the floor upon which it was to be placed. The court there said, in allowing recovery for extra work necessary to make it fit: "In other words, . . . defendants agreed (by such plans) to furnish the requisite surface for plaintiff to build on." It is plain from the provisions of this contract, hereinabove set out, that plaintiff herein agreed to furnish and prepare its own surface "to build on." Therefore, plaintiff should not be entitled to recover the cost of excess thickness (on implied warranty or otherwise) for the one single and simple reason that we hold he contracted in plain terms definitely and specifically that he should not be; but on the contrary agreed to build at the fixed price either with earth subgrade (to a certain point) and with concrete (as thick as the condition of the subgrade required it) to the elevations required by the specifications. None of the cases cited by plaintiff, and none we can find, hold that there can be an implied provision in a contract exactly opposite to and in direct conflict with a definite and specific provision therein. All authority is to the contrary. [3] "There can be no implied covenants in a contract in relation to any matter that is specifically covered by the written terms of the contract itself." [12 Am. Jur. 769, sec. 239 and cases cited.] "There can be no implication as against the express terms of the contract." [17 C. J. S. 780, sec. 328.] It is also our view on principle that there would be no such implication, against and overcoming definite and specific contract provisions. Instead of merely adding a provision by implication, that would clearly be writing a new and entirely different contract, with a contrary meaning. All of the law of contracts is against courts doing that. We hold that it should not be done.

Plaintiff cites another class of cases where the specifications, upon which the contractor was entitled to rely, positively misrepresented conditions unknown to the contractor. In United States v. Smith, 256 U. S. 11, 41 Sup. Ct. 413, 65 L. Ed. 808, there was a contract to excavate a ship canal to a certain width and depth. "The material to be removed was specified to consist 'of sand, gravel, and boulders;'." but more than a year later "there was discovered a natural

bed of limestone rock within the boundaries of the excavation.'' The contractor was allowed to recover the extra cost of this excavation. Likewise, in Faber v. City of New york, 118 N. E. 609, there was a mistake in the specifications furnished for construction of foundations for bridge piers so that the position of bed rock was incorrectly shown to be eight or nine feet farther below the surface than it actually was. The contractor was allowed to recover the difference in cost of removal. These cases hold that the specifications constituted a warranty as to the kind or position of material to be removed. Similar cases are City of Lima v. Farley, 7 Fed. (2d) 40 (where deliberate misrepresentation to defraud was alleged); Pitt Construction Co. v. City of Alliance, 12 Fed. (2d) 28; Montrose Contracting Co. v. County of Westchester, 80 Fed. (2d) 841; and Hollerback v. United States, 233 U. S. 165, 171, 34 Sup. Ct. 553, 58 L. Ed. 898, also cited by plaintiff. However, nothing was misrepresented in this case. Here the specifications were not drawn for any particular kind of soil, weather or other unusual conditions, and nothing unexpected was encountered. Plaintiff's president said: ''We didn't discover anything about the physical condition that we didn't know before.'' Therefore, these cases are not in point. Plaintiff knew from previous experience the ''variables'' to be considered in order to make the subgrade hold the pavement to seven inches.

Plaintiff further argues that defendant produced such extra thickness by its interference with and control and direction of the contractor's performance of the contract; and that ''ordinarily a contractor is not responsible for defects caused by acts or orders of the owner during the progress of the work.'' [Quoting from Mannella v. City of Pittsburgh (Pa.), 6 Atl. (2d) 70.] Plaintiff also cites Borough Construction Co. v. City of New York, 93 N. E. 480, where there was disagreement between the contractor and the City's engineer over the meaning of the contract. The engineer required that (in accordance with his construction) more expensive material should be used on all the work (instead of only certain parts according to the construction of the contractor which the court upheld), for which the contractor was allowed to recover. Plaintiff also cites Litchfield Construction Co. v. City of New York, 215 N. Y. Supp. 450. There the City's engineer required mixing of concrete at extra cost contrary to the manner provided in the specifications. In both these cases the contractor was specifically required to do and did do something additional that the contract did not provide for or require. However, in the final analysis, all that was required here was a setting of the machinery which would build the subgrade to the exact elevation prescribed by the plans and specifications. If the subgrade settled, the pavement would be too thick. If the forms settled, the pavement would be thin. (Some of it, in the spring, was too thin and had to be removed.) To be sure it would be thick enough, plaintiff followed

the inspector's suggestion of setting 1/8th inch lower for its fall work. It did not have to do that. The only thing it was ever made to do was to set back "on the money" when, in the spring, it set 1/8th inch high. Under the contract, the State did not have to take a chance on delay from reconstruction of thin pavement (and perhaps of not finding it) by allowing a high subgrade to be built. The point is that there was no interference with the work which changed what the contract required, or required anything additional or contrary to its specifications. Instead, there was a refusal to let plaintiff change the contract by building the subgrade above the elevations specified. We can see in this no ground for allowing extra compensation, when the contract said there should be none in any event; or for holding there was a breach by defendant's representatives' demands for exact compliance. Our view of the evidence is that the over performance made was due to the so-called variables, and plaintiff's preparation of the subgrade in face of them, and not to requiring the subgrade to be built to the agreed elevation. We do not find any substantial evidence to show a cause for which defendant could be to blame. To attribute the extra thickness to any other cause would be to base a verdict on surmise and speculation.

Furthermore, we are here dealing with a public contract, and under the law of this State such a contract must be definite and specific as to what is authorized to be done and compensation to be received. This contract could only be made in accordance with the authority granted by the Legislature. [Secs. 8115, 8116 and 8119, R. S. 1929, 10 Mo. Stat. Ann., 6899, 6900 and 6903.] The inspectors and engineers had no authority to vary its terms and it specifically so stated. Moreover, what they required was not a change in any respect but a literal compliance with it. It may be, as plaintiff intimates, that the contract provisions are too exacting and that it would be more reasonable for the Highway Commission to provide for payment for 1/2 inch overthickness, as it accepted (with proportional deduction) not more than ½ inch underthickness; or at least that it should not charge for its material used to that extent. However, that is a question which the Legislature authorized the Highway Commission to decide, in its discretion, over which we cannot assume control. It saw fit to offer the present form of contract which is neither prohibited nor illegal. Its effect was to require the contractor to choose between getting the subgrade to the contract elevation in such condition that it would not sink when concrete is put on it, or else to fill any sunken space with concrete at his cost. This meaning was too plain to be misunderstood. Plaintiff saw fit to accept this offer, whether profitably or not we do not know. We should assume it would bid according to the risks of all the stated variables which were well known to it. If it did not, we cannot make the contract over so that plaintiff may receive compensation for something

for which it specifically agreed to make no charge. Neither can we hold that it implied a warranty that the specifications would produce pavement exactly seven inches thick when it plainly contemplated that it would average both more and less and specifically provided what was to be done in either, or both, situations.

It is finally argued that the provision "which denies compensation for excess thickness of pavement and charges the contractor with all state-furnished materials used in extra thickness" is a penalty and, therefore, is void and unenforceable; and that this is true even if it be considered liquidated damages because defendant caused the breach of the contract. This contention cannot be sustained. In the first place, there was no breach of the contract caused by defendant or otherwise. Plaintiff's theory was that it was fully and faithfully performed. Overperformance, as shown here, was not a breach, but was, as we construe the contract, contemplated by both parties. In the second place, we cannot construe as a penalty either a provision that something not required will not be paid for or a provision requiring pay for material used when not required to be used for any purpose of the owner, such use by the contractor being at his option. According to plaintiff's own definition, there is a penalty "only where the agreement is to pay fixed sums plainly without reasonable relation to any probable damages." Certainly, an agreement to pay the value of defendant's materials used for the purpose stated does not fit this definition.

The judgment, as to Counts One and Two, is affirmed; as to Counts Three and Four, it is reversed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.