NORTH COUNTY SCHOOL DISTRICT R–1, Plaintiff-Respondent,

v.

FIDELITY & DEPOSIT COMPANY OF MARYLAND, a corporation,

and

Lead Belt Steel Erection Company, a corporation, Defendants-Appellants.

Nos. 36807 and 36783.

Missouri Court of Appeals,
St. Louis District,
Division Three.

April 27, 1976.

Motion for Rehearing or Transfer to Court En Banc or Transfer to Supreme Court Denied June 15, 1976.

Application to Transfer Denied Sept. 13, 1976.

Geoffrey L. Pratte, Roberts & Roberts, Farmington, Richard O. Funsch, St. Louis, for defendants-appellants.

R. A. Wegmann, Richeson, Roberts, Wegmann, Gasaway, Stewart & Schneider, Hillsboro, David L. Colson, Colson & Wagner, Farmington, for plaintiff-respondent.

SIMEONE, Presiding Judge.

These cases involve consolidated appeals by defendants-appellants, Lead Belt Steel Erection Company (Lead Belt) and Fidelity & Deposit Company of Maryland (F & D), from a judgment in favor of the plaintiff-respondent, North County School District R–1, entered upon a jury verdict by the circuit court of St. Francois County. The judgment in favor of North County was for damages in the sum of $8,492.41, allegedly sustained because of the faulty construction and installation of a metal roof on one of the School District's buildings. The appellants raise several points on these appeals, some of which we believe to be meritorious, and, hence, for reasons hereinafter stated, we reverse the judgment and remand for further proceedings.

In September, 1968, North County School District desired to build a multi-purpose lunchroom building on its Bonne Terre Campus situated between the North County Junior High School building and the Bonne Terre Elementary School. The board members and the superintendent of schools, Mr. Floyd L. Wilson, "worked up the specifications" for the construction of a metal building without the aid of an architect. The specifications were decided upon after the board members had visited similar buildings. The building was of the "Inland-Ryerson" type and was to be constructed of metal. The building was intended "to feed approximately 350 students" and was approximately 120 feet by 40 feet. The specifications were "approved and authorized by the School Board." Bids were let and eventually the bid of Lead Belt Steel and Erection Company, a dealer of Inland-Ryerson, was accepted. On October 14, 1968, a contract was entered into between appellant Lead Belt and the School District to construct the building. Mr. Donald E. Maxson was the president of Lead Belt.

The contract signed by the School board and Mr. Maxson provided that "[t]he work to be performed under the terms of this Specification shall consist of furnishing all labor and materials to erect and completely finish a pre-engineered steel panel building

for North County School District R–1." [1] The original contract price was $65,888.65. Because of some change orders requested by the District, there were additional costs amounting to $5,324.70,[2] making a total of $71,213.35. All this amount was paid to Lead Belt except $1,951.42 for which Lead Belt counterclaimed against the School District.

On November 5, 1968, Fidelity & Deposit Company entered into a surety performance bond binding the contractor and surety to the North County School District for the performance of the construction contract.

In due time, construction of the lunchroom began. The construction of the metal roof, the subject of this controversy, was to be installed by a process of laying metal sheets. The roof sheets were to overlap six inches and were sealed with caulk tape. The sheets were to be attached to the "purlins" (steel rafters) with tech screws and neoprene washers. Insulation was to be placed on top of the purlins before the roof was fastened down, and a drop ceiling with ceiling tiles was to be placed in metal webbing under the roof. Where the roof sheets overlapped a piece of caulk tape was placed on the bottom sheet and the top sheet laid over that. A screw was then inserted through the high rib of the corrugation to seal it and the screws were inserted through the flat part of the sheet to seal and hold it to the purlins.

After some initial delays caused by circumstances beyond the control of Lead Belt, the roof was constructed and installed by January or February, 1969, but there was much interior work to be done. When the building was first put under roof, Mr. Wilson noticed that it "started leaking." One of the leaks was in the storage area and was caused by the omission of a downspout done at the request of Mr. Wilson because it would cause ice to form on the sidewalk. When the downspout was put in, this leak was corrected. The second leak, according to Mr. Maxson, was caused by a "piece of flashing that was just lapped the wrong way." This leak was repaired by Mr. Maxson personally. According to Mr. Wilson, "shortly" after the roof was put on the roof leaked—"It was, it was coming—I don't know how it was coming through because like I said it wasn't up on the top part, but it was dripping through ruining the drop ceiling."

On April 14, 1969, the School District submitted to Lead Belt a "punch list" [3] which indicated in two portions thereof that the roof was leaking. On May 14, 1969, the School District submitted to Lead Belt a second "punch list," which made no reference to the roof leaking.[4] However, during a long period of time—as early as April 22, 1969, running through October 16, 1970—Mr. Wilson made complaints in the form of letters to Mr. Maxson of Lead Belt and to Inland-Ryerson concerning the leaking

---

1. The contract also required the contractor to "[f]urnish all required designs, supervision, labor tools, equipment, materials and supplies . . . and perform all work necessary to construct a 120′ × 48′ × 14′ and 40′ × 24′ × 14′ pre-engineered steel building to be used as a lunchroom for the North County School District R–1."

 As to the type of roof, the specifications provided that "[r]oofing shall consist of precision roll formed panels, Type AW 269A, as manufactured by Inland Steel Products Co., designed in accordance with AISI 'Specifications for the Design of Light Gage Cold Formed Steel Structural Members.'"

 The specifications also called for ridge panels to be in one piece, factory curved to match roof slope and the panels "shall be applied using a minimum end lap of 6 inches and fastened together over and to structural members. . . Panel side and end laps shall be sealed with an elastic type roll caulking to prevent the entry of moisture. . . ."

2. Throughout the transcript this figure varies. The amount of the change orders is sometimes shown as $5,863.29. That figure is also shown on Lead Belt's invoice of August 19, 1969. Regardless of these discrepancies, Lead Belt's counterclaim was for $1,951.42—the amount due upon the contract.

3. A term used in the industry which is a list of complaints about the construction.

4. According to the terms of the contract, ten percent of the contract price was to be withheld until substantial completion of the building. All but $1951.42 was paid, according to Mr. Maxson, "just in case the roof might start leaking again . . . ."

roof.[5] On October 14, 1969, a year to the day from the making of the contract, Mr. Wilson wrote to Maxson that "[d]ue to roof still leaking as of October 11th, 1969, Board still withholds final payment until they [sic] are satisfied that the roof will not leak."

Between January and September, Mr. Maxson made attempts to correct the situation. As to the two leaks which showed up initially, one was repaired after "we put the down spout in." The second leak was repaired by Mr. Maxson personally. After this, Mr. Maxson made two inspections of the building following two rains and found no leaks. After the complaints by Mr. Wilson, however, and after the June 22 letter, Mr. Maxson went to the building to "check about those leaks." He found that there were several roof sheets that were "kinked due to improper walking." He repaired these "kinks" by putting in "stitch screws" and pulling the sheets back together "thereby getting the seal again. The caulk tape that is used in there will seal back if you got some stitching in there to pull it back. It's similar to sewing thread, you know, you have to stitch it back together. So, I stitched it back together to stop the leaks." This was done several times. Sometime in August, 1969, when Mr. Maxson went to the building, he "found the children, there was three children playing on the roof just a runnin' up there just havin' a ball." He again put in some "lap screws" and informed Mr. Wilson that the children were playing on the roof. Once when he was at the school building he also found four custodians up on the roof "supposed to be cleaning out the gutters." He noticed they were not walking on the roof properly and "so I instructed them at that time." Sometime later, he again saw children on the roof and "thought, oh, well, what's the use and just drove on. I didn't even stop and run 'em off the building that time." Mr. Wilson admitted that at the time the final payment was denied, Mr. Maxson said that "the leaks were due to some kids walking on the roof."

The metal roof was intended to be walked upon in a special manner. "If you're going across the building . . . then you should walk directly over the top of the purlin," but "if you're going with the corrugation you should walk in the flat part of the [metal] sheet." When a sheet is bent down it causes it to kink and when there is weight "on the lap of the sheet," it breaks the seal.

Mr. Maxson continued to repair the leaks until about September, 1969, when the School District declined to make the final payment. Mr. Maxson stated that he installed the roof according to the plans and specifications and that the installation was done in a workmanlike manner.

At the time of trial in 1974, the building still leaked—it had "gotten worse," and "it just leaks through so bad now all over the entire building that kids move back and forth; it leaks on the tables. . . . On the lunchroom tables through the block ceiling now."

Mr. John F. Rodgers, the school custodian who came to work at the District in September, 1969, told of the leaks. ". . .

---

5. For example, on April 29, 1969, Mr. Wilson, in response to a letter from Inland-Ryerson which wanted to advertise the building, indicated that they were "experiencing difficulties with the building. The roof is leaking . .." On June 22, 1969, he wrote Mr. Maxson—" 'We are experiencing quite a bit of difficulty pertaining to water damage and leaks in the new lunchroom . . ..' " On July 15, 1969, he wrote to Mr. Maxson again on behalf of the Board. Another letter to Mr. Maxson was written on September 15, 1969. On the same date a letter was written to Inland-Ryerson complaining that the "roof on the building is leaking in several places and is getting worse with each rain. This has been reported to Mr. Maxson . . .." On October 14, 1969, after a visit to the building by Mr. William West of Inland, he wrote that after a hard rain over the weekend, "the building leaked as it has done in the past." He wrote again on October 30, 1969. He also wrote to F & D on October 30, 1969. In December, 1969, he wrote to Mr. Spannraft, assistant manager of Inland, complaining of the leaks. In April, 1970, he wrote to the subcontractor, Phil Crowley and Associates. On September 14, 1970, he again wrote Mr. Maxson. Finally, on October 16, 1970, he again wrote, denying Mr. Maxson's request for final payment. The next correspondence was with the attorneys for Lead Belt.

Back in the ladies toilet room even when it rains right now bad or it don't have to leak bad, it leaks so bad the ladies can't get in the bathroom. I have gallon buckets all over the back, all over the whole building where it leaks."

Mr. Ronald Evans, the assistant superintendent who came to the District in July, 1971, made several attempts with Mr. Rodgers to stop the leaks by using a "caulking compound." He did not see any children on the roof or any "vandalism" and was not informed how to walk on the roof.

After several complaints to Inland-Ryerson, the sales supervisor of Inland at that time, Mr. William H. West, inspected the building in October, 1969. "From all appearances it was constructed in all the proper manner. I looked for the alinement [sic] of the panels, the [alignment] of the purlins across to see they were in line. There were at that time two or three leaks in the building . . .." "[T]he roof was dented. And it appeared to have been where someone had stepped and bent the roof; stepped on the roof." He corroborated the manner of walking on the roof. If walking does not occur in the flat or on the purlins, ". . . you dent or crimp the sheets, it breaks the seal and it allows for water to come in, either blowing in or capillary attraction." [6]

In July or August, 1973, a building adjacent to the lunchroom was torn down, as the result of which debris were dropped onto the canopy portion of the roof causing indentations thereon. Although this was on the canopy portion of the roof, it was explained that the roof was all one system and "it still effects [sic] the whole side of the roof and the building. . . ." Mr. West explained that the "structural system of this building is what they call a 'continuous system' and when the sheets are put on it becomes one unit."

The impasse concerning the responsibility for the leaks in the roof finally resulted in this litigation. Although there were many pleadings and counter-pleadings, the principal pleadings upon which this cause was tried were: (1) The "First Claim" petition of North County as a real plaintiff against Lead Belt and F & D, (2) the answer of F & D and cross-claim against Lead Belt, and (3) the answer of Lead Belt to the "First Claim" petition and counterclaim by Lead Belt against North County praying for $1,951.42 still due upon the contract.[7]

The allegations of breach of contract in the "First Claim" petition filed on January 30, 1974, alleged that Lead Belt "has failed and defaulted in the performance of the contract aforesaid [October 14, 1968] in that it constructed the building aforesaid, in a careless, improper and unworkmanlike manner, in that the roof was installed wrong and backward, and in that the roof has caused the building to leak water and has leaked water ever since its construction." [8]

---

6. Mr. West made a report on October 17, 1969, to B.L. Clair, General Manager of Inland-Ryerson. In that report he stated: "I visited the above referenced job . . . and could find no apparent reason for the leaks. The job is well constructed and a very attractive building. I did find that the roof is badly bent and Don Maxon [sic] . . . says that was done by the school children playing on the roof.

Lead Belt Steel Erectors are doing everything possible to correct the leaks; however, when they correct one then another pops out. . . I also met with Mr. Floyd Wilson . . .. He assured me that Mr. Maxon [sic] has been very attentive to the problem, but he is concerned about the leaks.

[But], I think a great deal of the problem stems from Mr. Williams. He says that neither he nor any of his people have been on the roof, but from my conversation with Mr. Wilson, I found this not to be true. . . ."

7. The original petition for damages by North County against Lead Belt and F & D was in the form of a nominal plaintiff at the relation of a subcontractor. This was never dismissed and in fact Lead Belt answered the allegations therein.

8. In the first petition as nominal plaintiff, North County alleged that Lead Belt has failed "to perform and has breached the aforesaid contract in that it has failed to construct the proposed building *in accordance with specifications* or in a good and workmanlike manner in that said building and the roof and parts thereof does [sic] leak great quantities and sums of water into the building proper . . .." (Emphasis added.)

Lead Belt counterclaimed for the sum allegedly due under the contract, and F & D cross-claimed against Lead Belt praying for any judgment against Lead Belt that might be adjudged against it.[9]

Trial was finally held in November, 1974, during which the above facts were elucidated. During the trial, Mr. Rudolph H. Gentges testified for the plaintiff-North County. He was requested in September, 1972, to inspect the roof and make a recommendation to the Board. He had been in the "roofing and sheet metal business" since 1939. After inspecting the roof, he recommended "taking and putting insulation over the existing metal, filling the channels and then putting a rigid insulation over the top of that and then put a built-up roof over it."

In 1972, the cost of a built-up roof would have been $6,631.00, but at the time of trial that figure would increase by "around" 55 to 60 percent, or approximately $10,000.00. He believed his recommendation would solve the leakage. He acknowledged that a built-up roof is more expensive than a metal roof. Mr. Maxson and Mr. West also indicated that a built-up roof is more expensive, but that the lunchroom building was not designed to support such a roof without additional structural support.

At the close of the evidence, Lead Belt and F & D each moved for a directed verdict, which was overruled.

The court submitted Instructions Nos. 2 and 3—the plaintiff's verdict directors. Instruction No. 2 read as follows:[10]

"Your verdict must be for plaintiff North County School District R–1 on its claim for damages against defendant Lead Belt Steel Erection Company, if you believe:

First, defendant Lead Belt Steel Erection Company did not construct and install the roof so that the building would not leak, and

Second, because of such failure, defendant Lead Belt Steel Erection Company's contract obligations were not substantially performed, and

Third, Plaintiff North County School District R–1 was thereby damaged."

The court also submitted a damage instruction—Instruction No. 7.[11] Instruction No. 7 was MAI 4.01 verbatim.

During the argument of plaintiff's counsel, counsel attempted to explain to the jury the meaning of a performance bond. In doing so, he stated: "[I]t's something where a company, a big insurance company—" Objection was made. The trial court sustained the objection but denied a request to discharge the jury. No request was made for the jury to disregard the comment.

Also during the argument, North County's counsel requested the jury ". . . to come up with a verdict of $8492.31 [sic] . . . .." This figure was reached by reducing the amount of $10,443.83[12] (damages for the built-up roof) by $1,951.42 sought by Lead Belt on the unpaid balance of the contract under its counterclaim. At another point in closing argument, plaintiff's counsel again stated that the "verdict I'm asking for is in the amount of $8,492.41, and that gives credit for the amount of money Mr. Maxson is claiming on his counterclaim."

During its deliberation, the jury requested the document that plaintiff's counsel had

---

9. There were other pleadings, e. g., a third party claim by Lead Belt against Inland-Ryerson, but they are not within the issues presented on this appeal.

10. Instruction No. 3 was identical to Instruction No. 2, except that it was directed against Fidelity & Deposit on the performance bond.

11. Instruction No. 7: "If you find the issues in favor of the plaintiff, then you must award the plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any damages you believe it sustained as a direct result of the occurrence mentioned in the evidence."

12. This figure was arrived at based on the testimony of Mr. Gentges that the cost of installing a built-up roof in September, 1972, would have been $6,631.00, but that the cost would be 55% to 60% higher at the time of trial. Counsel added 57½% to Mr. Gentges' figure and came up with $10,443.83.

used in closing argument to determine the amount of plaintiff's damages. Shortly thereafter [fifteen minutes later], the jury returned the following verdict:

"We, the jury, find the issues for the plaintiff and against both defendants and assess plaintiff's recovery at $8492.41 (stating the amount), and we further find the issues for defendant Fidelity and Deposit Company of Maryland and against defendant Lead Belt Steel Erection Company, Inc. and assess defendant Fidelity and Deposit Company of Maryland's recovery at $8492.41 (stating the amount)." [13]

The jury, however, did not formally enter a verdict on Lead Belt's counterclaim, although they were provided with a verdict form. Judgment was entered on the jury verdict for the plaintiff, North County, and this appeal followed.

Appellants Lead Belt and F & D raise five points of alleged error on this appeal. It is contended that the trial court erred (1) in giving Instructions Nos. 2 and 3, plaintiff's verdict directing instructions; (2) in failing to grant the appellants' motions for directed verdict at the close of all the evidence; (3) in giving Instruction No. 7, plaintiff's damage instruction [MAI 4.01]; (4) in failing to declare a mistrial after plaintiff's counsel's reference to Fidelity & Deposit as a "big insurance company"; and (5) in accepting the verdict of the jury, because such verdict made no reference to Lead Belt's counterclaim and was thus not responsive to all issues.

 Initially, we are confronted with the issue of whether the case is in a posture for disposition on appeal, since the jury did not formally enter a verdict on Lead Belt's counterclaim for the amount due on the contract—$1,951.42. Appellants contend that the court erred in accepting the verdict, since the verdict made no reference to the counterclaim. We are of the opinion, however, that the matter is ripe for appeal. The law is well settled that an appeal can be taken only from a final judgment, and

that to be final and appealable, the judgment must dispose of all parties and all issues in the case. Ordinarily, where there is a counterclaim pleaded and relied upon, the verdict must state the finding of the jury on the counterclaim. However, there are certain exceptions to this general principle. One exception is found in those cases where the finding upon the plaintiff's cause of action necessarily carries with it a finding upon defendant's counterclaim, in which event the judgment should be sustained, even though it makes no mention of the counterclaim. *Staples v. Dent,* 220 S.W.2d 791, 792 (Mo.App.1949); *Commercial Nat. Bank of Kansas City, Kan. v. White,* 254 S.W.2d 605, 609 (Mo.1953). Another is that, although the verdict makes no mention of the counterclaim, it does not follow that the trial court erred in accepting the verdict. Although the verdict does not mention the counterclaim,

". . . [w]here, from the whole record, the conclusion is irresistible that the jury did consider and determine the issues presented by the counterclaim, the verdict should be regarded as responsive to the issues, although it does not mention the counterclaim by name. . ." *United Iron Works v. Twin City Ice & Creamery Co.,* 317 Mo. 125, 295 S.W. 109, 115–116 (1927).

In the posture of this case, we are convinced that from the whole record the conclusion is irresistible that the jury did consider and determine the issue presented by Lead Belt's counterclaim, and hence the verdict was responsive to the issues although the jury did not return a verdict on the counterclaim. The figure of $1,951.42—Lead Belt's counterclaim—was used throughout the trial. In closing argument, plaintiff's counsel twice referred to the amount of damages North County might be entitled to should the verdict be reduced by the amount due Lead Belt. Counsel quoted verbatim from the form of the verdict which was subsequently returned. During

---

**13.** This form of verdict which was requested to be returned by the jury, was quoted verbatim at the end of his closing argument and was referred to as the "first one" of the Forms of Verdict submitted by the court.

deliberation, the jury requested and received the figures which demonstrated how plaintiff's damages were computed. The amount of the verdict for North County— $8,492.41—is exactly equal to the damage figures suggested by plaintiff's counsel— $10,443.83—reduced by the amount of Lead Belt's counterclaim—$1,951.42. We thus believe that the verdict effectively disposed of Lead Belt's counterclaim and that, contrary to appellant's contention, the trial court did not err in accepting the verdict of the jury. Furthermore, we believe that under these unique circumstances the judgment is an appealable one.

We confront a much more serious issue— i. e., whether the court erred in denying the appellants' motions for directed verdicts.

As to this point, that the court erred in failing to grant the motions for directed verdicts, appellants contend that the evidence "established as a matter of law that the roof in question had been completed by defendant Lead Belt . . . in accordance with the plans and specifications drawn up by North County School District and that the leaks were caused by persons other than Lead Belt . . . ."

■ Of course, in determining whether the evidence of the plaintiff makes a submissible case, the court must consider the evidence in the light most favorable to the plaintiff, its evidence must be taken as true, plaintiff must be given the benefit of all reasonable and favorable inferences arising from all the evidence, and the court is to disregard the defendants' evidence except insofar as it may aid the case for the plaintiff. *Buxton v. Horn,* 452 S.W.2d 250, 251 (Mo.App.1970); Rule 72.01; 27 Mo.Digest, Trial ■■■ 3A Mo.Digest, Appeal & Error, ■■■

Taking the evidence in the light most favorable to the plaintiff and disregarding the unfavorable evidence, the whole thrust

of North County's case consisted of: (1) it entered into a construction contract with Lead Belt to construct the metal building according to certain specifications; (2) the roof leaked from the time the building was erected and continued to leak to the time of trial; (3) many complaints were made to various parties including Lead Belt; (4) North County's witnesses did not see children on the roof; (5) employees were not instructed as to how to walk on the roof; and (6) attempts were made to correct the situation by Mr. Maxson and others, but the situation was not fully corrected from the time the roof was put on until the time of trial.

■ Viewing all the evidence in the light most favorable to North County, the evidence fails to make a submissible case. There was no evidence presented by North County that the building was not erected according to the plans and specifications; there was no evidence that the roof was installed in a negligent and careless manner; and there was no evidence that the roof was installed in an unworkmanlike manner. Although the pleadings alleged a breach of contract in that the building was constructed in an improper and unworkmanlike manner and failed to conform to the specifications, no such evidence was presented at trial. The syllogism is thus: (1) the building was constructed, (2) the roof leaked, ergo (3) the roof was constructed in an unworkmanlike manner or failed to conform to specifications. This is insufficient to make a submissible case.

■ The law in this state as well as in other jurisdictions is settled that in actions for breach of a construction contract, the mere showing of some defect in the construction is not sufficient to establish a breach of contract [14] absent some substantial evidence that the terms of the contract were not complied with or that the work

14. The respondent, North County, frankly admits in its brief that:

"[t]he issue here is not any inherent defect in plans and specifications furnished by the owner; the issue here is whether the contractor performed its work without negligence

and in a workmanlike manner, i. e. construct and install the roof so that the building would not leak. In every contract to perform there is an implied agreement that the work will be done in a skillful and workmanlike manner. 17A C.J.S. Contracts § 329, p. 292 . . . ."

was done in an unworkmanlike manner by the contractor.[15]

This principle is particularly applicable in situations where the plans and specifications for construction were provided to the contractor. When the owner or another provides plans and specifications to a contractor, the contractor does not become an insurer that the plans and specifications are sufficient to obtain the result sought—the contractor does not become a guarantor. *Sandy Hites Co. v. State Highway Commission,* 347 Mo. 954, 149 S.W.2d 828, 833 (1941); *Will v. Carondelet Savings & Loan Association,* 508 S.W.2d 711, 715 (Mo.App. 1974); *Eveready Heating & S. H. M., Inc. v. D. H. Overmyer, Inc.,* 476 S.W.2d 153, 155 (Mo.App.1972).

The burden was on North County to show that Lead Belt either did not follow the plans and specifications or failed to construct the roof in a workmanlike manner. We believe North County failed to meet this burden. *Will v. Carondelet Savings & Loan Association, supra,* 508 S.W.2d at 715.[16]

As North County admits in its brief, the issue here is not any defect in the plans and specifications but whether Lead Belt performed its work without negligence and in a workmanlike manner. It is readily apparent that North County failed in its proof in this regard and, hence, failed to make a submissible case. The whole thrust of North County's evidence was that the roof leaked, from the time it was put on until the time of trial, and that numerous complaints were made. Although North County alleged in its petitions that the roof was installed in a careless, improper and unworkmanlike manner, there was no such proof. Hence, we believe the trial court erred in not sustaining the motions for directed verdict.[17]

However, in the posture of this appeal, we are constrained to remand the cause for a new trial on all issues. The theory of the plaintiff's case was a breach of contract. In that the plaintiff failed in its proof. The evidence does not establish that in no event could the plaintiff make a submissible case against the appellants. Hence, under well settled rules of appellate practice, the cause should be remanded for further proceedings.

" 'It is the settled practice of appellate procedure that a case should not be reversed, for failure of proof, without remanding, unless the record indicates that [all] the available essential evidence has been fully presented and that no recovery could be had in any event.' . . ." *Haferkamp v. City of Rock Hill,* 316 S.W.2d 620, 629 (Mo.1958), quoting from *Kickham v. Carter,* 314 S.W.2d 902, 907 (Mo.1958).

See also *Rockett v. Pepsi Cola Bottling Company,* 460 S.W.2d 737, 739 (Mo.App. 1970); *Green v. Ralston Purina Company,* 376 S.W.2d 119, 128 (Mo.1964).

Since the cause must be reversed and remanded for a new trial, we shall examine the other alleged errors raised by the appellants. Appellants contend that

---

15. Cf. *Burger v. Wood,* 446 S.W.2d 436, 441 (Mo.App.1969)—mere showing of fractured areas in asphalt driveway not sufficient, did not establish affirmative defense of recoupment, specific defects shown; *Freeman Contracting Company v. Lefferdink,* 419 S.W.2d 266, 275 (Mo.App.1967)—mere fact of fireplace shoved out of line did not constitute proof of bad workmanship; *Shimek v. Vogel,* 105 N.W.2d 677, 684 (N.D.1960)—leaking roof.

16. Carondelet complained about cracks in the plaster and terrazzo floors, water seepage and color changes in the "marblecrete." There was no question that the defects Carondelet complained of existed, but Carondelet presented no evidence that these defects occurred as a result of failure to follow the plans and specifications, nor was there any evidence to show that the defects occurred as a result of any negligence on the part of the contractor. See Annot., Construction Contractor's Liability to Contractee for Defects or Insufficiency of Work Attributable to the Latter's Plans and Specifications, 6 A.L.R.3d 1394, 1397 (1966).

17. *Smith v. Gerhardt,* 220 S.W.2d 85 (Mo.App. 1949), cited by North County in support of its contention that the trial court properly overruled the motions for directed verdict, is not controlling. In *Smith,* proof was offered to show failure of the builder to follow the requirements of the contract.

the trial court erred in submitting Instructions Nos. 2 and 3, the plaintiff's verdict directors. Appellants argue that under these instructions the jury would have to find in favor of the plaintiff if for any reason the roof leaked at any time. North County, however, argues that the instruction follows MAI 26.02 and that the jury could only find in its favor if it found that Lead Belt "did not construct and install" the roof so that the building would not leak.

Instructions Nos. 2 and 3 required verdicts to be returned against Lead Belt if the jury found (1) that Lead Belt "did not construct and install the roof so that the building would not leak," (2) "because of such failure, defendant Lead Belt Steel Erection Company's contract obligations were not substantially performed," and (3) that North County was thereby damaged.

MAI 26.02 requires that the verdict must be for the plaintiff if the jury believes (1) the defendant did not [here insert the nature of the breach] and (2) because of such failure, defendant's contract obligations were not substantially performed, and (3) plaintiff was damaged. We believe that Instructions Nos. 2 and 3 are insufficient.

■ MAI 26.02 is intended for use in situations wherein the existence and terms of a contract are undisputed and the sole question for the jury to decide is whether the defendant has breached that contract, and, if so, the damage resulting. *Varn Co. v. Hamiltonian Federal Savings & Loan Ass'n,* 488 S.W.2d 649, 651 (Mo.1973). Prior to MAI, an instruction which informed the jury (1) that a contract had been entered into whereby defendant agreed to construct a house, (2) that the defendant failed to erect said building in a substantial and workmanlike manner so that the structure was defective was held to be proper. *Pitzer v. Hercher,* 318 S.W.2d 397, 398–399 (Mo. App.1958). The theory of the plaintiff's case and the nature of the alleged breach by Lead Belt was its failure to construct and install the roof, in the words of the respondent, "without negligence and in a workmanlike manner" so that the building would not leak. We believe that the jury should have been instructed that its verdict should be for the plaintiff if it found that Lead Belt did not construct and install the roof in a workmanlike manner (or in accordance with the plans and specifications) and as a result of which the roof leaked.[18]

The breach did not consist in failing to construct and install the roof so that the building would not leak, but in failing to construct and install the roof in a workmanlike manner so that the building would not leak. Yet, these instructions permitted the jury to find for North County if the roof was not constructed and installed so that the building would not leak. The instruction was thus deficient.

Appellants also contend that the trial court erred in giving Instruction No. 7, the damage instruction, because (1) the instruction used the word "occurrence" and the instruction did not limit or describe the word occurrence so as to exclude damages that may have been done by acts of third persons on the roof, and (2) did not limit the damages to the cost of completion of the contract or cost of repair.

■ Instruction No. 7 was MAI 4.01 verbatim.[19] There is no particular damage

---

18. In order to properly submit the issue of breach of a construction contract, the plaintiff's verdict director must state that the breach arises from the failure to construct in a careful and workmanlike manner. See *Pitzer v. Hercher, supra,* 318 S.W.2d at 398–399; *Clark v. Campbell,* 492 S.W.2d 7 (Mo.App.1973). See the instruction in *Clark, supra,* at 8—"Your verdict must be for plaintiff if you believe: First, defendant did not construct the house in a substantial and workmanlike manner, and Second, because of such failure, defendant's contract obligations were not substantially performed. . . ."

19. The Notes on Use indicate that the word "occurrence" should be adequate except in cases where there is evidence that two different occurrences produced the injury with defendant being responsible for only one. In such cases, counsel will need to substitute some descriptive term which will properly limit the jury to the occurrence produced by defendant. *Homm v. Oakes,* 453 S.W.2d 679, 681 (Mo.App.1970); *Jurgeson v. Romine,* 442 S.W.2d 176, 177 (Mo.App.1969); *Vest v. City*

instruction in MAI for a breach of a bilateral contract. MAI 4.01 is to be used not only in actions of tort but also in actions in contract. In *Stamm v. Reuter,* 432 S.W.2d 784, 786 (Mo.App.1968), this court held that it was not error to use MAI 4.01 in a breach of contract case. Our Supreme Court agreed. At least until a more detailed form is provided in MAI, "it is appropriate to use 4.01" in a contract case. *Boten v. Brecklein,* 452 S.W.2d 86, 93 (Mo.1970). However, in a situation such as this, where there were several occurrences that could have, under the evidence, caused the defect in the roof, we believe that the damage instruction should be modified and limited so the jury may award such damages as it believes the plaintiff sustained as a direct result of the defendant's *breach of the contract.*[20]

■ Appellants contend that Instruction No. 7 was erroneous because it did not limit damages to the cost of completion or the cost of repair but instead gave the jury a roving commission to award damages based on the cost of an "entirely different and more expensive type of roof . . .."

■ The measure of damages for the nonperformance, incomplete or defective performance of a building contract has been often repeated. General rules applying the measure of damages for breach of contract are stated as " 'the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it has entailed * * *. Compensation is a value of the performance of the contract. . ." *Boten v. Brecklein, supra,* 452 S.W.2d at 93,

National Bank and Trust Company, 470 S.W.2d 518, 520–521 (Mo.1971). Cf. *Fletcher v. Cummings,* 532 S.W.2d 890 (Mo.App.1976).

**20.** See the modification in *Boten v. Brecklein, supra,* 452 S.W.2d at 92—" '. . . you believe they sustained as a direct result of the defendant's termination of said contract.' "

**21.** See Dobbs, Remedies, § 12.21, pp. 897–903 (1973). The proper measure of damages is amount it would reasonably take to make the building conform to what it should have been

quoting 25 C.J.S. Damages § 74, pp. 843, 846–849 (1966).

" 'For a breach by defective construction, whether it is partial or total . . . the injured party can get a judgment for damages measured by the reasonable cost of reconstruction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste (destruction of usable property). . . .' " *Samuels v. Illinois Fire Insurance Company,* 354 S.W.2d 352, 357 (Mo.App.1961), quoting from 5 Corbin on Contracts, § 1089, p. 485 (1964).[21]

Since there is no applicable MAI instruction detailing the proper measure of damages for a breach of a building contract by defective construction, the use of MAI 4.01 has been held to be appropriate at least until a more detailed form is provided. The measure of damage therefore becomes a matter of evidence. Hence, there was no error in giving Instruction No. 7 in this regard.

In the event of a retrial, evidence as to damages should conform to the rules relating to damages by defective construction. We cannot say on this record that the damages testified to by Mr. Gentges conformed to such principles.

■ Lastly, North County's reference in closing argument to a "big insurance company" may not again occur. Such comments are improper. ". . . A comparison between the size, power or wealth of the litigants is wholly extraneous and should not be made by counsel. . . ." *Green v. Ralston Purina Company, supra,* 376 S.W.2d at 127. In this case, objection was made immediately and the objection

under the requirements of the contract. *Pitzer v. Hercher, supra,* 318 S.W.2d [3]. "[T]he general rule with respect to building contracts is that the disappointed owner may recover the costs of completing the promised performance or making necessary repairs, unless under the facts it is impossible to do so or the cost of completion or repairs would constitute unreasonable economic waste, in which event reference would be made to the difference in value formula. . . ." *525 Main Street Corp. v. Eagle Roofing Co., Inc.,* 34 N.J. 251, 168 A.2d 33, 35 (1961).

was sustained. We find no abuse of discretion under these circumstances in failing to declare a mistrial. *Rohlfing v. State Farm Fire and Casualty Company,* 349 S.W.2d 472, 478–479 (Mo.App.1961).

We have read the entire transcript, the briefs and authorities relief upon by the parties, and we are convinced that, in accordance with the views expressed in this opinion, the judgment rendered in favor of North County should be reversed and remanded for further proceedings on all issues.

The judgment is reversed and the cause remanded.

GUNN and RENDLEN, JJ., concur.