Paul KELLEY Jr., and Connie Kelley, Trustees of the Paul Kelley, Jr. and Connie Kelley Joint Revocable Trust Dated November 16, 2006, Plaintiffs/Appellants,

v.

**WIDENER CONCRETE CONSTRUCTION, LLC, Defendant/Respondent.**

No. SD 32149.

Missouri Court of Appeals, Southern District, Division One.

June 11, 2013.

Peter J. Lasley, of Carthage, MO, for Appellants.

James M. Paul, of Neosho, MO, for Respondent.

## WILLIAM W. FRANCIS, JR., J.

Paul Kelley Jr. ("Paul"),[1] and Connie Kelley ("Connie"),[2] Trustees of the Paul Kelley, Jr. and Connie Kelley Joint Revocable Trust dated November 16, 2006 (the "Trust"), appeal from a judgment, after a bench trial, awarding them damages for the cost to repair garage doors. The Kelleys assert two points of trial court error. We affirm the judgment of the trial court.

### Facts and Procedural Background

Viewing the record in the light most favorable to the trial court's judgment, *Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 523 (Mo.App. E.D.1998), the record reveals that the Trust is the owner of real estate located at 1909 Sherry Lea Drive in Neosho, Newton County, Missouri (the "residence"). The Kelleys reside at that address. The Kelleys hired Widener Concrete Construction, LLC ("Widener") to pour concrete at the residence.

On December 1, 2007, Paul and Widener entered into a written contract whereby Widener agreed to pour approximately 7,000 square feet of concrete at the residence and stamp, color and seal the concrete, to include a driveway, sidewalk, and patio, for a total cost of $29,540. The pattern selected for the concrete driveway, patio, and sidewalk was a "random stone" pattern. Paul testified the concrete was supposed to be poured four inches thick. Widener warranted and guaranteed its work would be completed in a "substantial workmanlike manner."

Darin Widener ("Darin"), co-owner of Widener, had only three years' experience doing stamp concrete at the time of the Kelley project. Widener testified that when he first met with the Kelleys, their primary concern was they "[j]ust wanted a nice driveway to go in front of a nice home" and "not just plain broom work[.]"

Within three or four days after Widener finished the concrete job, Paul noticed some faint random cracking in the concrete, which continued to get worse. The random cracks were about eight to twelve feet apart and the cracks were located throughout the driveway, patio, and sidewalk area. When the random cracks first developed, they were approximately an eighth of an inch thick, but continued to widen. Paul stated that within six months of the time the concrete was poured, the concrete started "sparring [sic] and chipping" off—some spots as large as two inches wide and three or four inches long. In the three years since the concrete was poured, the cracks and chips have continued to deteriorate and there are cracks eight to twelve feet in length all the way down the driveway and patio area. Paul contacted Darin on numerous occasions regarding the problems with the concrete, but Darin did not return to fix any of the problems.[3] Darin testified he was un-

---

1. Paul Kelley Jr., is sometimes referred to in the record as "J.R. Kelley."

2. Because a portion of the involved parties share the same surname, for ease of reference, we refer to the parties by their first names. We mean no familiarity or disrespect. Paul and Connie are also referred to collectively as the "Kelleys."

3. Darin did return to the residence to patch an area of the driveway that was only an inch and half thick and to install an electrical

aware of any cracking problems or an electrical conduit problem until after he was "sued."

In addition to the random cracking throughout the driveway, patio, and sidewalk areas, the garage doors, and metal trim surrounding the garage doors, were splashed with either concrete or stain. As a result, the garage door panels and trim were stained. Darin admitted that the garage area should have been covered.

The Kelleys had two independent inspections done of the concrete after the problems developed to see if the concrete could be fixed—Ron Jones ("Jones"), a professional engineer and owner of JMH Construction Company ("JMH"), and Jeffrey Herman ("Herman"), owner of Mid-Con Construction Company ("Mid–Con"), both inspected the residence in October 2009.

On November 30, 2009, the Kelleys filed a "Petition" alleging Widener failed to perform its work in a workmanlike manner by failing to: (1) place any or adequate contraction and expansion joints in the concrete; (2) cover and protect the garage doors, which resulted in concrete splashing on the doors and trim; (3) properly install an electrical sleeve across the driveway; (4) pour four inches thick of concrete in the driveway; (5) seal part of the stamped concrete; and (6) properly stain the concrete. Because of Widener's failure to perform its work in a workmanlike manner, the Kelleys alleged the concrete developed numerous cracks and chipping exposing unstained sections of concrete and ongoing deterioration of the concrete; and

the garage doors and trim were permanently stained. The Kelleys had demanded Widener repair or replace the concrete and garage doors, but Widener refused and continued to refuse to do so. In the petition, the Kelleys "pray[ed] for judgment against [Widener] in an amount which is fair and reasonable[.]"

On October 27, 2011, a bench trial was held. Jones and Herman both testified on behalf of the Kelleys.

Jones testified JMH was a general contracting business experienced in working with concrete and had been in business since 1979. Jones inspected the concrete work performed by Widener to determine if the problems could be fixed, or if the concrete would need to be replaced. Jones testified he observed a lot of random cracking throughout all the concrete work, as well as chipping and spalling[4] in some of the cracked areas, and noticed some discoloration on the garage door and trim.

It was Jones' opinion that the random cracking and spalling he observed were due to the lack of contraction joints. He testified contraction joints are important in decorative or stamped concrete to control where the concrete will crack. Jones stated it was possible for concrete to crack elsewhere besides at the contraction joints, but typically those cracks are few. He stated contraction joints should have been spaced eight to ten feet apart throughout the length of the driveway. Jones opined that the random cracking and spalling he observed could have been prevented had there been contraction joints put in place.

sleeve near the gates on the driveway. This electrical sleeve or conduit had to be re-cut into the concrete, after which mortar was placed on the surface of the concrete, which has since chipped out. Darin admitted he forgot to install the electrical conduit.

4. Jones described "spalling" as where "the surface of the concrete will pop loose, due to freeze-thaw cycling. Moisture will get into the material, and then when it freezes, it'll pop off." When spalling occurs and the surface area pops off, the concrete that is exposed underneath is a different color from the surface concrete.

Jones testified it was his professional opinion that the concrete work done was not performed in a substantial workmanlike manner. Jones also expected the random cracking and spalling to increase over time. Additionally, Jones also testified that the discoloration that occurred on the garage door and trim area could have been prevented by putting a protective surface on those areas and by failing to do so, Widener did not perform that work in a substantial workmanlike manner.

Jones testified that the problems he observed with the random cracking, chipping and spalling could not be repaired. It was his opinion the only option available was to remove and re-pour the concrete. Jones prepared an itemized bid as to what it would cost to remove and replace the approximately 7,000 square feet of concrete. The cost to remove the concrete was $36,750, and the cost to pour and replace the concrete was $80,500. The bid also called for removing and replacing the garage doors and trim at a cost of $4,650. The total amount of Jones' bid was $121,810.

Herman also testified on behalf of the Kelleys.[5] Herman was also asked to inspect the concrete work and to give his opinion as to whether the concrete could be repaired or whether it needed to be replaced. Herman testified the first thing he noticed was that there were no expansion joints or saw-cut contraction joints in the concrete. Herman explained that a contraction joint is cut in concrete to relieve the shrinkage, and is a standard practice used to control cracking and is 99 percent effective. It was Herman's opinion that contraction joints should be used in stamped or decorative concrete.

Herman's testimony was similar to that of Jones concerning the cause of the cracks and the necessary remedy.

Herman also prepared an estimate for what he thought the cost would be to repair and replace the existing concrete. The bid included demolition and removal of the existing concrete at a cost of $37,750, and re-pouring the concrete in a similar pattern at a cost of $83,050. Additionally, the cost to replace the garage doors and metal trim was $6,100. The total cost was $133,250.

Darin testified he discussed with the Kelleys the construction techniques that needed to be involved concerning contraction and expansion joints, and that the Kelleys made the decision to go "without the joints." Darin admitted that the contraction and expansion joints would have helped eliminate cracking in the driveway, but stated "concrete's always going to crack, and you're never going to control it[.]"

Although Darin claimed that the driveway was structurally sound even though it had cracks and would continue to spall, he admitted that the concrete driveway, sidewalk, and patio, with all of the random cracking and spalling, was not "a good looking job." He admitted that you can help control where the cracks are going to occur with contraction joints, and the random cracking throughout the concrete at the residence was caused by a lack of contraction joints.

Widener called Larry Neff ("Neff"), a real estate broker in the Neosho area since 1969, as a witness. Neff testified he was familiar with the housing market in Neosho because he is "constantly buying, or selling, or—or involved in the real estate

5. Herman's company, Mid–Con, is a concrete construction company which has been in business for nineteen years.

business." He testified he had owned and operated a real estate office for 30 years, built over 300 homes in the Neosho area, six subdivisions, and close to 500 housing units. Neff testified the subdivision where the residence was located contained "high-end" homes in the Neosho area.

Neff was retained by Widener two days prior to trial to inspect the residence, which he did the day before trial.[6] Neff's inspection of the residence took approximately fifteen minutes and consisted of walking "from the driveway to the garage and then around to the left, towards the swimming pool." The residence did not have a swimming pool, but rather a fish pond. Neff did observe cracking and areas that had been chipped off exposing concrete underneath. Neff did not take any notes or take any pictures while at the residence.

Neff estimated that approximately 60 percent of the homes in that subdivision had cracks in the driveway, although he did not spend any more than four or five minutes each inspecting the other driveways in that area on the same day he inspected the residence. It was Neff's opinion that the condition of the Kelleys' driveway did not affect the market value of the house significantly one way or the other. Neff testified that based on his experience, the cracks in the driveway, unless it changed the elevation or the concrete was breaking off, really had no monetary effect on the real property value and no monetary effect on a prospective buyer. It was also Neff's opinion that the expense involved in removing the existing driveway and replacing the concrete was not justi-

fied to balance out the value to the residence.

Paul testified he was not pleased with the appearance of the concrete driveway, patio, and sidewalk because of all the cracking and chipping; he believed it would continue to get worse; and he was upset that money had been spent on a job that was not done right. Paul considered the concrete driveway, patio, and sidewalk to be an investment at the time Widener was hired to do the work and he thought it was something that would add value to the residence. Paul also testified he thought the concrete in its current condition, with the cracks and chipping, affected the value of his property based on the fact that friends and other people have commented on the quality of the work and he thought that would affect a buyer.

Paul estimated the current value of his home was approximately $600,000. Paul stated his opinion as to what the difference in the value of the property would be with the concrete in its current condition, as compared to the value had the work been done properly, was however much it would cost to fix or replace the problem and that is what he would consider the diminution of value to be. He did not give a specific figure. Paul testified he just wanted fixed what he paid for.

On June 5, 2012, the trial court made its "Judgment Entry Findings of Fact & Conclusions of Law" ("Judgment") and entered judgment in favor of the Kelleys and against Widener in the amount of $4,560.[7] The trial court made specific findings of fact and conclusions of law including that:

---

6. Neff did not have permission from the Kelleys to inspect the residence.

7. We note that the Kelleys' expert, Jones, estimated the replacement cost for the garage doors and trim at $4,650, but the trial Court's Judgment awarded the Kelleys $4,560 as the

replacement cost. We do not know if this is the amount the trial court actually intended to award the Kelleys, or whether it is a possible typographical error. In any event, since neither party raised the issue on appeal, this Court will not address the issue.

(1) Widener warranted and guaranteed that its work would be completed in a substantial workmanlike manner; (2) the concrete driveway, patio, and sidewalk sustained numerous random cracking, chipping and spalling on the surface thereby exposing unfinished concrete below those areas within a few months of Widener finishing the job; (3) the numerous, random cracks and chipping were the direct result of Widener's failure to perform its work in a substantial workmanlike manner; (4) it was possible the numerous random cracks and chips would continue to deteriorate and get worse; (5) Widener failed to perform its work in a substantial workmanlike manner in failing to place any or adequate contraction joints in the concrete driveway, patio, and sidewalk resulting in numerous random cracking, chipping and spalling; (6) Widener failed to perform its work in a substantial workmanlike manner in failing to place any or adequate expansion joints in the concrete driveway, patio, and sidewalk resulting in numerous random cracking, chipping and spalling; (7) Paul himself had expertise in working with or pouring concrete; (8) Paul did not specifically instruct Widener not to use expansion joints or contraction joints, but the parties did discuss the issue; (9) Widener did not specifically recommend or advise Paul there should be contraction joints; (10) the Kelleys were not advised by Widener, or they did not know, that a reduction in the number of recommended expansion joints or freeze joints might result in additional cracks; (11) Widener failed to cover and protect the garage doors and metal trim areas while pouring and staining the concrete, which resulted in the concrete and stain splashing onto the doors and metal trim, and resulted in Widener failing to perform its work in a substantial workmanlike manner; and (12) Widener failed to initially install an electrical sleeve across the concrete driveway, which was a result of Widener's failure to perform its work in a substantial workmanlike manner.

The trial court concluded that: (1) although the cracks and chips may continue to deteriorate and get worse over time, the concrete did not need to be replaced; (2) tearing out or replacing the concrete was not the only way to repair and address the problems with the numerous cracks and chips in the concrete although the court found no evidence was presented that there was any other method to repair the concrete without tearing out the concrete and replacing it; (3) the staining on the garage doors and metal trim did need to be replaced; (4) the reasonable costs of reconstruction of the concrete driveway, patio, and sidewalk areas, as well as the garage doors and metal trim, was somewhere between $121,810 and $133,250, but that the cost of repairs would "involve unreasonable economic waste" and "is not justified as a practical matter and such cost estimates are not the proper measure of damages"; (5) the court disagreed with the Kelley's contention that the applicable measure of damages was the reasonable cost of reconstruction and completion in accordance with the contract, if possible, and did not involve unreasonable economic waste; (6) the applicable measure of damages was the diminution in value—"the difference in the value of [the Kelleys'] property in its current condition as compared to the value [the Kelleys'] property had if the construction had been done in a substantial workmanlike manner"; and (7) the Kelleys offered no evidence as to diminution of value of the residence and no evidence nor opinion as to the value of the property, whereas Widener provided evidence that there was no real effect on the property's valuation.

The trial court ultimately entered judgment in favor of the Kelleys and against

Widener in the amount of $4,560, the cost to remove and replace the garage doors, plus court costs. This appeal followed.

In their three points on appeal, the Kelleys contend the trial court erred in its damage award. The issues presented for our determination are:

1. Did the trial court err in applying the diminution in value of the residence as the measure of damages, rather than applying the cost of repairs or reconstruction to the concrete driveway, patio, and sidewalk areas as the measure of damages.

2. Did the trial court err in awarding the Kelleys a judgment in the amount of $4,560 for damages because the damage award was against the weight of the evidence and based only upon the cost of replacement of the damaged garage doors, which was inconsistent with other portions of the Judgment applying a "diminution of value" measure of damages to the entire property.

## Standard of Review

■■■ In a court-tried case, we will affirm the trial court's judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "The trial court's judgment is presumed valid, [and] the burden is on the appellant to demonstrate its incorrectness[.]" *Harness v. Wallace*, 167 S.W.3d 288, 289 (Mo.App. S.D.2005). A judgment should be set aside as "against the weight of the evidence" only with caution and only when the reviewing court has a firm belief that the judgment is wrong. *Murphy*, 536

S.W.2d at 32; *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo.App. S.D.2010).

■■■ This Court defers to the trial court's credibility determinations. *Houston*, 317 S.W.3d at 186. "That is because credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of any witness's testimony." *Watson v. Moore*, 8 S.W.3d 909, 911 (Mo.App. S.D.2000) (citing *Herbert v. Harl*, 757 S.W.2d 585, 587 (Mo. banc 1988)). "[W]e should not reject a finding of fact by the trial court unless we can point to some good reason for doing so ... or are compelled by the record to conclude that such finding is clearly erroneous." *Burger v. Wood*, 446 S.W.2d 436, 442 (Mo. App. Spfld.D.1969) (internal citations omitted).

## Analysis

The issues in this appeal revolve around the appropriate measure of damages and the trial court's damage award. The particular facts and circumstances of each case dictate which measure of damages is appropriate. *Kahn v. Prahl*, 414 S.W.2d 269, 282 (Mo.1967). Here, the Kelleys argue in Point I that the trial court applied the wrong measure of damages: the diminution in value of the residence rather than the cost of repairs or reconstruction of the concrete. In Points II and III,[8] the Kelleys argue the calculation of the damage award was against the weight of the evidence and inconsistent with the trial court's earlier rulings because it amounted to a "cost of repair" award for the garage doors rather than a "diminution of value" award. Because all three points depend on the application of the proper measure of

---

**8.** In the argument portion of the Kelleys' brief, Points II and III are identical; however-er, different arguments follow each point.

damages, we discuss the Kelleys' points together.

In *Business Men's Assur. Co. of America v. Graham*, 891 S.W.2d 438 (Mo.App. W.D.1994), the Western District provided a thorough analysis of the measure of damages test that applies in defective construction cases:

In recent years, appellate courts have found the facts and circumstances of construction cases, where there is **substantial** but defective performance by a contractor, dictate a **measure** of **damages** different from the **measure** of **damages** in customary cases involving injury to real property. *Compare* [*White River Dev. v. Meco Systems*], 806 S.W.2d [735, 741 (Mo.App. S.D. 1991)] (holding that the general rule for **damages** in construction cases is the cost of repair, and that **diminution** in **value** is only appropriate where the cost of reconstruction would involve unreasonable economic waste) and [*Lawing v. Interstate Budget Motel, Inc.*], 655 S.W.2d [774, 778 (Mo.App. E.D.1983)] (holding that the general rule for **damages** in construction cases is the cost of repair) *with* [*Tull v. Housing Auth. of City of Columbia*], 691 S.W.2d [940, 941–42 (Mo.App. W.D.1985)] (holding that, in non-construction situations, the general test for **damages** is **diminution in value**).

Although the measure of damages available to an owner in a defective construction case is "cost of repair" and the "diminution in value," the same as for general real property, *White River*, 806 S.W.2d at 741; *Lawing*, 655 S.W.2d at 778; [*Hensic v. Afshari Enterprises, Inc.*], 599 S.W.2d [522, 524 (Mo.App. E.D.1980)], it is the manner in which these methods are applied that is different. In real property cases, courts generally utilize the "diminution in value"

test, turning only to the "cost of repair" test when it constitutes a lower amount of recovery. *Tull*, 691 S.W.2d at 942. In defective construction cases, on the other hand, the "cost of repair" test is favored, so that courts normally determine the damages by assessing the cost of correcting the defects or supplying the omissions. *Stege v. Hoffman*, 822 S.W.2d 517, 520 (Mo.App. E.D.1991); *White River*, 806 S.W.2d at 741; *Rust & Martin, Inc. v. Ashby*, 671 S.W.2d 4, 6 (Mo.App. S.D.1984); *Lawing*, 655 S.W.2d at 778; *Forsythe v. Starnes*, 554 S.W.2d 100, 109 (Mo.App.1977); *North Cty. Sch. Dist. v. Fidelity & Deposit Co.*, 539 S.W.2d 469, 480 (Mo.App.1976); *Edmonds v. Stratton*, 457 S.W.2d 228, 233 (Mo.App.1970); 13 Am Jur.2d *Building and Construction Contracts* § 79 (1964).

An exception to the general rule for defective construction cases occurs when the cost of reconstruction and completion in accordance with the contract would involve unreasonable economic waste. *White River*, 806 S.W.2d at 741; *Rust & Martin*, 671 S.W.2d at 6–7; *Lawing*, 655 S.W.2d at 779; *Forsythe*, 554 S.W.2d at 109; *North Cty. Sch. Dist.*, 539 S.W.2d at 480; 13 Am.Jur.2d *Building and Construction Contracts* § 79 (1964). In the instance where the cost of repair method would result in the destruction of usable property or would be grossly disproportionate to the results obtained, the owner's damages should be calculated by the diminution in value formula. *White River*, 806 S.W.2d at 741; *Rust & Martin*, 671 S.W.2d at 6–7; *Lawing*, 655 S.W.2d at 779; *Forsythe*, 554 S.W.2d at 109; *North Cty. Sch. Dist.*, 539 S.W.2d at 480; 13 Am.Jur.2d *Building and Construction Contracts* § 79–80 (1964). The contractor has the burden of proving that repairing the defect would result in un-

reasonable economic waste. *Rust & Martin,* 671 S.W.2d at 8.

*Business Men's Assur. Co. of America,* 891 S.W.2d at 450 (footnote omitted) (emphasis in original).

▇ "[T]he goal of damages in a contract action is to place the injured party in the same position that the party would have been in had the contract been performed[.]" *White v. Marshall,* 83 S.W.3d 57, 62 (Mo.App. W.D.2002). The preferred measure of damages, as a general rule, in cases of substantial but defective performance by a contractor, is the cost of reconstruction or repair. *County Asphalt Paving Company, Inc. v. The 1861 Group, Ltd.,* 908 S.W.2d 184, 186 (Mo.App. E.D. 1995). The "cost rule" measures damages by the cost of repairing the defective work. *Id.*

▇ The "diminished value rule," [9] an exception to the "cost rule," is "the difference between the value of the property with the defective work and what its value would have been if it had been construed according to the terms of the contract." *White River,* 806 S.W.2d at 741. The diminished value rule applies only when the cost of reconstruction or repair would involve "unreasonable economic waste." *County Asphalt,* 908 S.W.2d at 186. "Unreasonable economic waste" has been described as "destruction of usable property," *see Rust & Martin,* 671 S.W.2d at 4, or when the cost of repair is disproportionate to the diminution in value of the property. *See County Asphalt,* 908 S.W.2d at 186; *Cucchi Construction,* 973 S.W.2d at 527.

▇ The appropriate measure of damages is dependent upon the evidence presented to the trial court. Once the owner presents evidence of the cost of reconstruction or repair, the burden then falls upon the contractor to present evidence that the cost of reconstruction is unfair economic waste so that the diminished value rule exception should apply. *County Asphalt,* 908 S.W.2d at 186. If the contractor fails to present any evidence of the diminution in value of the property, the contractor fails to meet its burden. *Id.* at 187.

▇ Here, the Kelleys presented evidence from two experts that the reasonable cost of reconstruction of the concrete driveway, patio, and sidewalk areas, as well the garage doors and metal trim, was somewhere between $121,810 and $133,250. However, the trial court found that the cost of repairs would "involve unreasonable economic waste." The Kelleys contend it was not economically wasteful to replace the concrete because the driveway was unique and the cost of repair was not disproportionate to the diminution in value of the property.

The question is was there substantial evidence before the trial court to support the finding that the cost of repair constituted unreasonable economic waste? The answer is yes. Widener called Neff, a real estate broker in the Neosho area since 1969, who testified he was familiar with the housing market in Neosho because he was "constantly buying, or selling, or—or involved in the real estate business."

Neff was retained by Widener two days prior to trial to inspect the residence, and identified as an expert about a day and a half before trial. On the morning of trial, the Kelleys' attorney made a record regarding Widener's last-minute identification of Neff as an expert. The trial court was willing to give the Kelleys a three-month continuance of the case so they could have an opportunity to talk to Neff,

9. Also referred to as the "diminution in value rule."

but Paul, after being advised of the risks—"pros and cons"—by his attorney, agreed to proceed with trial. Paul acknowledged on the record that by proceeding with trial, he was waiving any objection to the late disclosure of Neff as an expert witness or their ability to get a witness to counter Neff.

Neff was permitted to testify about his inspection of the residence two days before trial. He inspected the residence for approximately fifteen minutes and observed cracking and areas that had been chipped off exposing concrete underneath. Neff estimated that approximately 60 percent of the homes in that subdivision had cracks in the driveways, and it was Neff's opinion that the condition of the Kelley's driveway did not affect the market value significantly one way or the other. Neff testified that based on his experience, the cracks in the driveway, unless it changed the elevation or the concrete was breaking off, really had no monetary effect on the real property value and no monetary effect on a prospective buyer. It was also Neff's opinion that the expense involved in removing the existing driveway and replacing the concrete was not justified to balance out the value to the residence. There was no evidence in the record that the driveway was not usable.

 "The issue of damages is left to the sound discretion of the trial court as the trier of fact, *Carl v. Dickens*, 809 S.W.2d 466, 470 (Mo.App. S.D.1991), and a trial court has wide discretion in its determination of damages." *Fidelity Nat'l Title Ins. Co. v. Tri–Lakes Title Co. Inc.*, 968 S.W.2d 727, 733 (Mo.App. S.D.1998); *Iota Mgmt. v. Boulevard Inv. Co.*, 731 S.W.2d 399, 421 (Mo.App. E.D.1987). With Neff's testimony, Widener met its burden of production of evidence that the cost of repair is disproportionate to the diminution in value of the property.

 The Kelleys did not present expert testimony to rebut Neff's testimony. The only testimony the Kelleys presented regarding diminution in value was from Paul. Paul testified he thought the cracks and chipping in the concrete affected the value of his property and would affect a buyer because friends and other people had commented on the poor quality of the work. Paul testified the diminution of value in this case is the cost to fix or replace the concrete. While a homeowner is qualified to express an opinion upon the diminution in value in his property, the weight and value given to such opinion testimony is left to the trier of fact. *St. Louis Cnty. v. Taylor–Morley, Inc.*, 923 S.W.2d 507, 511 (Mo.App. E.D.1996). Keeping in mind that credibility and the weight given to testimony is a matter for the trial court, *Watson*, 8 S.W.3d at 911, the trial court was free to believe none, part, or all of Neff and/or Paul's testimony. "We will not invade the trial court's province, as the trier of fact, to determine the weight and credibility of the evidence as to damages." *Stom v. St. Clair Corp.*, 153 S.W.3d 360, 365 (Mo.App. S.D.2005).

Thus, the trial court did not err in applying the diminution in value as the measure of damages as this measure of damages was supported by substantial evidence. Point I is denied.

 In Points II and III, the Kelleys argue the trial court's damage award of $4,560 to replace the garage doors, was against the weight of the evidence and inconsistent with other portions of the Judgment applying a "diminution of value" measure of damages to the entire property.[10]

10. The Kelleys also argue the damage award was not supported by substantial evidence.

[A]n against-the-weight-of-the-evidence challenge presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment, but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact.

*Houston,* 317 S.W.3d at 186. Although we consider evidence contrary to the judgment in an against-the-weight-of-the-evidence argument, we again defer to the trial court's credibility determinations when considering whether the judgment is against the weight of the evidence. *Id.*

 The Kelleys discuss all of the four required steps in an against-the-weight-of-the-evidence challenge.[11] *Houston,* 317 S.W.3d at 187. However, support of their position would require this Court to insert our credibility determinations in place of the trial court's determinations, and essentially become an advocate for the Kelleys, which we cannot do. *Stickley v. Auto Credit, Inc.,* 53 S.W.3d 560, 563 (Mo.App. W.D.2001). The Kelleys argue the testimony from the two experts that the only way to correct the damaged concrete was to remove it at a cost of $121,810 to $133,250, was "significant and overwhelming evidence" that the damage award of $4,560 was inadequate. This ignores the

fact that the trial court determined that removal and replacement of the concrete would constitute economic waste. Accordingly, the diminution in value measure of damages applied rather than the cost of repair.

The Kelleys also argue Paul's opinion testimony as to the diminution in value of the residence demonstrated that the trial court's damage award was against the weight of the evidence. As previously noted, a contractor's burden is to present evidence of diminution in value once the owner has presented evidence of cost of repair. Here, both the Kelleys and Widener presented evidence of diminution in value. The Kelleys acknowledged Neff's testimony that there was no diminution in value from the damaged concrete "may justify the amount awarded by the trial court[.]"

Clearly, the trial court had before it competing testimony as to the diminution in value, with testimony from Neff and Paul. The credibility of the witnesses and that testimony was for the trial court's determination as the trier of fact. To support the Kelleys' position that the damage award was against the weight of the evidence would require this Court to demonstrate how Paul's testimony was more credible than Neff's testimony, which we are prohibited from doing. *Boyd v. Boyd,* 134 S.W.3d 820, 824 (Mo.App. W.D.2004).

In light of our finding that the diminution in value measure of damages was supported by substantial evidence, that issue has been addressed.

11. An against-the-weight-of-the-evidence challenge requires completion of the following four sequential steps:
(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
(2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition. *Houston,* 317 S.W.3d at 187.

Finally, the Kelleys' "inconsistent" argument ignores Missouri case law recognizing that both measures of damages may be applied: "Where there is substantial but defective performance by a contractor, damages to an owner are determined by *either or both of two different standards*[.]" *White River*, 806 S.W.2d at 741 (emphasis added). Where there are multiple defects, the diminution in value rule may apply to some and the cost rule to others. *Id.* Here, it was not error to apply the diminished value rule to the concrete and the cost rule to the garage door damage.

Kelleys' Points II and III are denied. The trial court's judgment is affirmed.

GARY W. LYNCH, P.J., and NANCY STEFFEN RAHMEYER, J., Concurs.