**HERCULES CONSTRUCTION COMPANY,**
Plaintiff-Respondent,

v.

**C.J. MORITZ COMPANY,**
Defendant-Third Party
Plaintiff-Appellant-Respondent,

v.

**JOHN F. STEFFEN ASSOCIATES, INC.,**
Third Party Defendant-Respondent,

and

**Western Engineering & Manufacturing Company, Third Party Defendant-Appellant,**

and

**Lyon Sheet Metal Works, Inc., Third Party Defendant-Appellant.**

Nos. 45319, 45324 and 45354.

Missouri Court of Appeals,
Eastern District,
Division Two.

July 12, 1983.

John T. Bruere, St. Charles, for Western Engineering.

Joel D. Monson, St. Louis, for Lyon Sheet Metal.

Merle L. Silverstein, Clayton, for Hercules.

Timothy R. Anderson, St. Louis, for Moritz.

DOWD, Judge.

Plaintiff-respondent Hercules Construction Company (hereinafter Hercules) brought suit for breach of contract against its subcontractor, C.J. Moritz Company (hereinafter Moritz) to recover expenses it incurred as general contractor in replacing a supply air fan at the St. Charles Civic Center. In the court tried case, defendant Moritz impleaded John F. Steffen Associates, Inc. (hereinafter Steffen), Western Engineering & Manufacturing Company (hereinafter Western), and Lyon Sheet Metal Works, Inc. (hereinafter Lyon), as third party defendants. At the close of Moritz' evidence, the trial court sustained Steffen's motion for a directed verdict and denied similar motions by Western and Lyon. At the conclusion of all the evidence, the trial court rendered judgment on behalf of Hercules in the amount of $24,970.76. The trial court also awarded defendant-third party plaintiff Moritz judgment against both of the remaining third party defendants (Lyon and Western) in the amount of $8,161.60 each. We affirm.

The controversy involves the alleged faulty installation and performance of a supply air fan which was installed in the St. Charles Civic Center for that building's heating, ventilation, and air conditioning system (hereinafter called HVAC). Hercules was the general contractor for the construction of the civic center. Moritz was the subcontractor who was in charge of the HVAC system. Steffen was the consulting engineering firm hired by the city's architect to design and formulate the plans and specifications for the HVAC system. Western was the manufacturer of the fan in question and Lyon was the installer of the fan.

The agreement between Hercules and Moritz was embodied in a written contract which placed the entire responsibility for the HVAC work upon Moritz. Article II of

this contract, denominated "Subcontractor's Responsibilities," includes a specific paragraph covering warranties, quality of work, and defects. That provision reads as follows:

"The Subcontractor warrants that all materials and equipment furnished and incorporated by him in the Project shall be new unless otherwise specified and that all Work under this Subcontract shall be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not conforming to these standards may be considered defective. The warranty provided in this Paragraph 11.9 shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Contract Documents."

In formulating its bid on the project, Moritz made available the specifications for the supply air fan to Combustion Kinetics Corporation (hereinafter Combustion), the locally licensed dealer and representative for Western, so that Moritz might obtain a price quote for a Western supply air fan. After receiving notification that its bid was accepted, Moritz issued a purchase order to Combustion for a Western Vaneaxial supply air fan per specifications.

The specifications provided that the supply fan could be either the type manufactured by Joy, a competitor of Western, or a type of similar specifications. The contract documents also set forth the specifications of the Joy fan: one capable of producing 40,000 cubic feet of air per minute at 6.3 inches of *static* pressure. (emphasis ours)

Western prepared shop drawings for the supply air fan it manufactures and submitted these drawings for approval to the project architect and to Steffen, the consulting engineers. Western's shop drawings indicated a fan producing 40,000 cubic feet of air per minute at 6.3 inches of *total* pressure. (emphasis ours) Steffen approved these shop drawings as being in conformance with the building specifications even though the shop drawings used total pressure while the specifications called for static pressure. At the time of the trial,

Western could not determine whether it possessed information regarding the fan's specifications when the shop drawings were prepared.

The specifications specifically provide that the architect's approval of shop drawings shall not relieve the contractor of responsibility for any deviation from the requirements of the contract documents, nor shall the architect's approval relieve the contractor from responsibility for errors or omissions in the shop drawings. According to the agreement between Hercules and Moritz, the subcontractor (Moritz) is bound to the contractor (Hercules) by those same terms.

The specifications called for a fan which could be mounted horizontally, vertically, or at any incline. Lyon's foreman, who was in charge of installation of the fan, interpreted from these specifications that the fan could be installed in any fashion. Lyon's crew installed the fan with the device known as the vortex damper operator on the bottom side of the fan. In comparison with Western's diagram of the fan, the fan was inverted.

The City of St. Charles took occupancy of a portion of the building in April of 1976 and the HVAC system became operational in May of the same year. Witness Carl Austin, the building superintendent for the City of St. Charles, testified that there was trouble with the fan from the very beginning in 1976 and in early 1977 the wires in the motor exploded.

In 1976, Mr. John Flynn was in charge of Hercules' field operations at the St. Charles Civic Center construction site. He testified concerning three instances in 1976 when the fan failed to operate. On these occasions the fan's actuater linkage was found broken. Mr. Flynn further testified that he inspected the plans, drawings, and specifications and determined that the fan had been mounted in an inverted position. Mr. Keith St. Onge, Western's product manager, testified that the probable cause of the wires exploding was the excessive moisture in the motor. This moisture was not able to escape through the "weep holes" in the fan

because these were located on top of the motor, due to the fan being mounted in an inverted position.

The Senco Corporation conducted a performance test of the supply air fan shortly after it was installed. The results thereof are known as a balancing report. According to the balancing report, the supply air fan was producing 33,273 cubic feet of air per minute while the specifications for the fan called for 40,000 cubic feet of air per minute. Moreover, the reading of 33,273 cfm was obtained at a total pressure of only 4.8 inches—substantially less than the 6.3 inches of total pressure which Western designed the fan to work against.

In May of 1977, Western's field service representative inspected the supply air fan at the civic center. Western's report on the inspection indicated that the linkage on the activator was broken, the blade shanks were binding, the sensor controls were manually overridden to keep the fan at a maximum pitch, the fan housing had fatigue cracks, and the fan was installed upside down. The Western field service representative placed additional braces on the fan to support the motor, recommended that the fan be rotated to allow the motor condensate drains to work, and indicated that some welding would be necessary in order to repair cracks in the fan housing.

A second field service report dated August 20, 1976, disclosed that the fan assembly and conduit box were inundated with water from condensation and the field service report on November 24, 1976, revealed that the fan linkage was again sheared off and needed to be replaced. During this period of time, the fan blades were binding part of the housing and several blades were loose. Inspection of the inside of the fan's housing disclosed marks showing where the blades were hitting and forming grooves. According to Western's field service representative, the fan was being operated in a stalled condition while being kept at a maximum pitch and that the total pressure inside the system was around eight inches. Western's product manager testified that the Western fan installed in the civic center

was not manufactured to operate continuously under these conditions. This witness further testified that when a fan is misapplied to a system with a higher pressure than that which it is designed for, the fan will go into a stall condition and eventually will fail, which is exactly what happened. Such failure would be marked by blades vibrating and eventually breaking loose.

James Chumley, who replaced John Flynn as vice-president of operations at Hercules, testified that when the fan was in an inverted position, moisture which formed could not escape from the motor housing because the "weep holes" were located above rather than below the motor. Chumley further testified that the collection of moisture can cause a deterioration of the packing materials and bearing and it might cause the wiring and windings on the motor to fail.

Another defect in the installation of the fan was explained by the Western representative who testified that the static pressure sensor control was installed too close to the fan. He said this results in erratic readings and causes a continual changing of the blade pitch which can cause failure in the linkage and excessive wear.

On January 30, 1978, the blades on the supply fan sheared off near the hub. After repair efforts failed, Hercules and Steffen determined that a replacement fan was required in order to restore heat to the building. Because of the severely cold temperatures at the time, efforts were made to locate a replacement fan that could be installed as soon as possible.

The replacement fan was installed by Lyon and put into operation in March of 1978. Hercules paid the invoices of the companies which were involved in supplying and installing the replacement fan.

■ The present existing standard of review requires that we affirm the trial court's ruling unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law.

Rule 73.01; *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976).

The only point relied on by appellant Moritz in alleging that the trial court erred in entering judgment in favor of respondent, Hercules, is that there was no substantial evidence to support the judgment. In support of this point, Moritz contends that Hercules did not establish a causal connection between the damaged condition of the fan on January 30, 1978, and the condition of the fan at the time of installation or the nature of its installation. For authority, Moritz cites *North County School District R–1 v. Fidelity & Deposit Company of Maryland*, 539 S.W.2d 469 (Mo.App.1976), and *Will v. Carondelet Savings and Loan Association*, 508 S.W.2d 711 (Mo.App.1974). The very evidence missing in *North County* and in *Will*, however, is present in the instant case.

■ Specifically, there was evidence that the terms of the contract were not complied with and that the work was done in an unworkmanlike manner. Furthermore, according to its warranty, Moritz had the obligation to furnish and install a fan of good quality, free from faults and defects, in a good and workmanlike manner, and to make sure that the fan and its installation complied with specifications. However, substantial evidence was adduced at trial to find (1) that the fan installed was not according to specifications and incapable of delivering the required amount of air; (2) that the fan was installed upside down; (3) that the static pressure sensor control was installed too close to the fan; (4) that the fan's housing repeatedly cracked from fatigue, had to be welded and rewelded, and eventually became distorted; (5) that no access panels were provided; (6) that the linkage repeatedly broke; and (7) that the fan blades were rubbing against the housing. Upon review of the aforementioned factual situation, we find that substantial evidence was presented to the court below to demonstrate that Moritz breached both its subcontract with Hercules and its warranty that the fan would be free from faults and defects and in accordance with the specifications.

■ Moritz also argues that even if there were defects in the fan itself or in its installation, there is no evidence that such defects were the cause of the fan's ultimate failure in February of 1978. We disagree. A review of the record reveals substantial evidence supporting Hercules' contention that the fan was installed in an unworkmanlike manner and that said installation could have caused or contributed to the fan's failure. Specifically there was testimony that the excessive moisture caused by the fan's installation could cause pitching, binding of the blades, corrosion, linkage problems, eventual breaking of the blades, and shorting out of the wiring. It was further established that the faulty placement of the static pressure sensor would cause it to put out erratic readings, cause the fan to continuously change pitch, and thereby cause excessive wear and failure in the linkage. Finally, there was evidence that the cracks in the fan's housing necessitated continual repairing and reworking of the system. Accordingly, we find the substantial evidence adduced clearly justified the judgment of the trial court.

Third party defendant Lyon also appealed from the judgment of the trial court alleging that there was no substantial evidence adduced from which it could be inferred that the manner in which Lyon installed the fan contributed to the fan's ultimate breakdown. We disagree.

■ The evidence reflects that the fan was installed upside down contrary to Western's shop drawing and that this could cause pitching, binding of the blades, corrosion, linkage problems, eventual breaking of the blades, and shorting out of the wiring. With the exception of corrosion, all of the aforementioned problems did develop with the fan. Therefore, we find there was substantial evidence from which the trial court could have found that the unworkmanlike installation of the fan by Lyon contributed to its breakdown.

■ Third party defendant Western also appeals from the judgment of the trial court, alleging four points for review. Western first argues that the fan was supplied in accordance with specifications. Under Missouri law, strict compliance with terms of the contract is not required and substantial compliance must be accepted. *Gundaker v. Templer,* 560 S.W.2d 306, 309 (Mo.App.1977). Although the contract called for a fan capable of producing 40,000 cubic feet of air per minute at 6.3 inches of *static* pressure and Western supplied a fan designed to be capable of producing 40,000 cubic feet of air per minute at 6.3 inches of *total* pressure, the fact remains that the fan performed substantially below specifications when tested shortly after it was installed. According to the balancing report, the supply air fan was producing only 33,-273 cubic feet of air per minute. Furthermore, the specifications called for a fan which could be mounted horizontally, vertically, or at any incline. The fan supplied by Western could be installed properly only in one way because of the placement of the drainage holes on the motor. Consequently, we find that there was substantial evidence supporting the trial judge's finding that the fan produced by Western was defective and that this condition contributed to its ultimate breakdown.

■ Secondly, Western contends that there was no testimony to show that the fan was not merchantable as built. We disagree. The concept of fault is represented in breach of warranty cases by the element of defect. *Smith v. Old Warson Development Company,* 479 S.W.2d 795, 798 (Mo.banc 1972). In this case, the evidence showed that prior to producing and placing a fan on the market, Western would normally be told the performance required of the fan. Since the fan produced by Western did not perform up to the level required by the specifications or up to the level noted on Western's own shop drawing, we find that there was substantial evidence from which the trial judge could have found that the fan was defective.

■ Western also argues that the trial court erred in holding it liable to Moritz because there was no implied warranty of the fan's fitness for a particular purpose. This argument was not presented to or ruled upon by the trial court and is therefore not preserved for appeal. *Berghorn v. Reorganized School District No. 8, Franklin County,* 364 Mo. 121, 260 S.W.2d 573, 583 (1953).

In its final point, Western argues that there was no substantial evidence to prove that the alleged breach of contract by Moritz caused the damages Hercules suffered. This issue was dealt with above and we see no reason to repeat our discussion here.

Moritz alleges that the granting of a motion for a directed verdict on behalf of Steffen was erroneous because the filing of such a motion is improper in a court tried case.

■ Although customarily used in jury cases, on appeal, we will treat a motion for a directed verdict at the close of plaintiff's evidence in a court tried case as a motion to dismiss for failure to make a submissible case or a motion for judgment. *Moser v. Williams,* 443 S.W.2d 212, 215 (Mo. App.1969). Since this was a court tried case, our review from such a decision is encompassed by the principle of *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976) and we should affirm the decree of the trial court unless it erroneously applies the law.

■ A directed verdict at the close of plaintiff's case is a drastic measure and should be done only when all of the evidence and reasonable inferences to be drawn therefrom are so strongly against plaintiff that there is no room for reasonable minds to differ. *Crouse v. Burkemper,* 593 S.W.2d 234, 235 (Mo.App.1979). In its petition, Moritz alleges that the plans of the HVAC system were "negligently and unskillfully" drawn by Steffen because the HVAC system, when operating at normal and specified speed and position, was not sufficient to produce the amount of air required by the specifications. However, Moritz presented no evidence to suggest

that the plans submitted by Steffen were negligently drawn in failing to comply with reasonable engineering standards. Therefore, we find that there was no room for reasonable minds to differ and the motion for a directed verdict was properly sustained.

Judgment affirmed in all respects.

SNYDER, P.J., and GAERTNER, J., concur.