**GILMARTIN BROTHERS, INC.,**
**Plaintiff/Respondent,**

v.

**Fernando and Reynalda KERN,**
**Defendants/Appellants.**

No. 67160.

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 19, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 20, 1996.

Application to Transfer Denied
March 26, 1996.

John A. Kilo, H. Clay Billingsley, Michael H. Izsak, St. Louis, for appellants.

James J. Sauter, St. Louis, for respondent.

RHODES RUSSELL, Judge.

Defendants Fernando and Reynalda Kern ("Kerns") appeal from a judgment in favor of Plaintiff Gilmartin Brothers, Inc. ("Gilmartin") in a court-tried action for breach of contract for construction of a residence and from a judgment in favor of Gilmartin on their counterclaim. We affirm.

The facts, viewed in the light most favorable to the result reached by the trial court, establish the following. Gilmartin was in the business of developing real estate and building and selling homes. On June 4, 1991, the Kerns, as husband and wife, entered into a new home sale contract with Gilmartin for the construction of a three bedroom home for a base price of $145,000.00. The Kerns paid $15,000.00 in earnest money.

Approximately two weeks after the contract was signed the parties became aware that the sewer line in the street had collapsed, making the sewer hookup impossible. The cost of the repair of $10,000.00 was divided equally between Gilmartin and the Kerns. The parties agreed to increase the base price of the contract to $150,000.00 to accommodate the change. The written contract was changed by hand and initialed by the parties. Before the contract was changed, Gilmartin advised the Kerns that they could renounce the contract if they so chose. The Kerns declined.

In August of that year, the Kerns decided to include certain upgrades and extras to the house, including the addition of a gas fireplace, crown molding, window grills, brick porches, a special front door and a Jaccuzi tub for the bath. The price for the upgrades and extras totaled $6,935.00, which was paid by the Kerns separate from the contract terms.

Then, in September of 1991, another problem arose. When the construction crew started construction and first broke ground they encountered rock. The crew continued the excavation but after two days they determined that to dig to the proposed depth of the basement would increase costs considerably. The general contractor, along with the Kerns, decided the chipping should stop and that the foundation should be poured at that depth, thereby raising the foundation of the house and thwarting their plans for a home with no stairs. At that point, the cost to chip the rock and pour the foundation at that depth increased the contract price by $7,000.00. The costs were explained to the Kerns and the parties agreed to increase the

base price for the house to $157,000.00. The contract was marked accordingly and initialed by the parties.

Due to the problems with the sewer in the street and the rock during excavation, the general contractor was concerned it would run into rock in the street when putting in the sewer. The general contractor explained this to the Kerns and everyone agreed to go forward with the plans.

The plans were again modified while doing the inside work. At the request of the Kerns, the plans were changed to make the house have two bedrooms instead of three as originally planned. Gilmartin agreed to the change and proceeded to remove the interior wall between the two rooms.

In January of 1992, when the house was almost complete, the contractors were preparing to do the sewer work and make the lateral hookup. On January 7th, an additional work authorization was given to do the sewer work required by the Metropolitan Sewer District ("MSD"). This work totaled $4,217.00, which included charges for permits, increases due to the changes and rerouting of the sanitary right-of-way, the removal of an existing manhole and the construction of a new outside drop manhole. The crew doing this work also ran into rock. Therefore, on January 20th another work authorization was issued allowing a tractor with a hydraulic breaker to remove the rock at a cost of $95.00 per hour. The crew expended 80 hours of work for a total of $7,600.00. Thereafter, on January 29th, another work authorization was given to the sewer company to cut the asphalt and excavate for the water service, break the rock, backfill with limestone, repair the pavement and construct an additional outside drop and new manhole with encasements, all as required by MSD. This work was $2,270.00. In addition, the bill to complete the project included $800.00 for rock fill and hauling for the lateral hookup and $800.00 for extra rock for coverage of the main. The sum total for this work was $15,687.00.

During the month of January the Kerns were notified of problems as they arose. In fact, the Kerns were at the construction site on average three or four times a week throughout the construction. The Kerns knew there would be additional costs to remedy the problem with the sewer and remove the rock found at the site. At the time the work authorizations were made, it was impossible to itemize the cost or predict what the total would be because the total cost depended on the number of hours worked, which depended on the amount of rock encountered.

As the home was completed the Kerns prepared for the move. They applied for occupancy and water permits, acquired insurance, put down money for deposits, and even started to receive mail at the new home. The Kerns also moved a chandelier from their old home and affixed it to the dining room in the new home.

On February 13, 1992, Gilmartin was informed by the sewer company of the final amount due for the work done in January. On that same day Gilmartin made out an itemized list of extras for the house, totaling $20,971.00. Included in that total was $15,687.00 for "extra sewer & rock" for the work performed in January. Also included on the list were the following items: fireplace marble and mantel for $318.00, electrical extras for $2,300.00, chair rail for breakfast room for $50.00, extra crown molding for $325.00, horseshoe driveway for $800.00, tie wall for $900.00, and porch rails for $591.00. The list was given to the Kerns in mid-February. The exact date of delivery was disputed. Upon reviewing the list the Kerns requested a copy of the complete sewer bill. Gilmartin and the general contractor hand delivered the bill to the Kerns on either February 14th or 19th. Again, the actual date of delivery was subject to dispute among the parties.

On February 25, 1992, Gilmartin received a letter, by courier, from Henry M. Miller, an attorney. The Kerns had sought advice from Miller concerning the construction and purchase of the house. In the letter, Miller notified Gilmartin that the Kerns wished to rescind the contract and to recover all monies paid. The parties had been set to close pursuant to the contract two days later on February 27, 1992.

Upon receipt of the letter, Gilmartin signed a listing agreement with Laura McCarthy, Inc., a real estate broker, to sell the house. On August 20, 1992, the two bedroom house was sold for $139,650.00, for a net sale price of $130,920.16.

Gilmartin thereafter filed suit against the Kerns for breach of contract asserting they improperly repudiated the contract.[1] The Kerns counterclaimed for rescission of the contract and the return of the earnest money plus damages, for misrepresentation and for breach of contract. The trial court issued its ruling without specific findings of fact and conclusions of law. The court rendered judgment in Gilmartin's favor on its contract claim and awarded $53,339.16 in damages.[2] All charges contained in the counterclaim were disposed of in favor of Gilmartin.

 The standard of review in a court-tried case is governed by the principles enunciated in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We will sustain the judgment of the trial court unless it is not supported by substantial evidence, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Id.* at 32. In reviewing court-tried matters, the appellate courts give due deference to the trial court and its unique ability to judge the credibility of the witnesses. *Trapp v. Barley*, 897 S.W.2d 159, 164 (Mo.App.1995). We must uphold the judgment of the trial court if the result was correct on any tenable basis. *Id.*

 In their point one, the Kerns challenge the judgment in Gilmartin's favor on the breach of contract claim. The Kerns argue the court's order is against the weight of the evidence and contrary to the law. We

note at the outset that this court is to exercise its power to set aside a judgment on the ground it is against the weight of the evidence with caution and with a firm belief that the judgment is wrong. *Murphy v. Carron*, 536 S.W.2d at 32.

The relevant contract provisions read in pertinent part:

4. In the event rock is encountered upon excavating, or in the event of increased costs after the approval of this Contract by Seller, Seller shall have the option to increase the sale price, which Seller shall exercise by notifying Purchasers by certified mail of the amount of such increase. Purchasers shall within ten (10) days thereafter, have the option to pay such increase or to cancel this Sale Contract, in which latter event the earnest deposit (and any other sums paid by Purchasers to Seller hereunder) shall be returned and both parties shall thereupon be relieved of all obligations hereunder. Purchasers' failure to elect (by written notice to Seller by certified mail) to cancel this Sale Contract shall be deemed acquiescence by Purchasers to payment of such increase.

. . . .

16. The entire and whole agreement between the parties is contained in the Sale Contract and Addendum if attached hereto, and there are and shall be no additions, amemdments (sic) or changes hereto unless approved by the parties in writing.

The Kerns assert they exercised their option to cancel the contract under paragraph 4. In ruling in favor of Gilmartin, as the court did, the Kerns claim the court construed Gilmartin's action in providing the list

---

1. Gilmartin also included counts for trespass and abuse of process. The abuse of process count was dismissed and the trespass charge was decided in favor of the Kerns.

2. Damages were calculated as follows:

| | |
|---|---:|
| Contract Price | $ 157,000.00 |
| Down Payment | − 15,000.00 |
| | $ 142,000.00 |
| | |
| Interest Paid to Carry Loan | $ 7,891.83 |
| Amount Paid by Kerns | − 3,698.70 |
| | $ 146,193.13 |

| | |
|---|---:|
| Bill for Sewer and Extras | $ 20,971.00 |
| Amount Paid | − 0.00 |
| | $ 167,164.13 |
| | |
| Misc. Charges from 2/25/92 to Sale | $ 7,408.03 |
| Amount Paid | − 0.00 |
| | $ 174,572.16 |
| | |
| Net Sale Price | − $ 130,920.16 |
| Statutory Interest at 9% | + 9,687.16 |
| | $ 53,339.16 |

of "extra" items as an acceptable way to exercise its option to increase the sale price although it did not strictly comply with the contract. Strict compliance would require Gilmartin to notify the Kerns of the price increase specifically through certified mail, which both parties concede was not done. The Kerns argue the judgment is internally inconsistent in that, in the Kerns' opinion, the court allowed Gilmartin to only substantially comply with the terms of the contract while holding the Kerns to strict compliance with the contract. We disagree.

The law is clear that strict compliance with the terms of the contract is not required and substantial compliance must be accepted. *Winn–Senter Const. Co. v. Katie Franks, Inc.,* 816 S.W.2d 943, 945 (Mo.App. 1991); *Hercules Const. Co. v. C.J. Moritz Co.,* 655 S.W.2d 779, 785 (Mo.App.1983). A party's performance under a contract is substantial if the deviation from the contract was slight and if the other party received substantially the same benefit it would have from literal performance. *Gundaker v. Templer,* 560 S.W.2d 306, 309 (Mo.App.1977). Whether or not a contract has been substantially performed depends on the facts and circumstances of the particular case. *In re Estate of English,* 691 S.W.2d 485, 489 (Mo. App.1985).

Parties may by agreement establish a practice, a method of modifying the terms of the contract, which the parties accept as complying with the contract. *H.B. Deal Const. Co. v. Labor Discount Center, Inc.,* 418 S.W.2d 940, 950 (Mo.1967). When such an agreement is made, the parties become bound thereby and it is enforceable by the court. *Id.*

Keeping in mind the foregoing principles, and looking to the record as a whole in this case, we find that although the contract required increases or changes be in writing, through their actions and dealings, the parties waived literal compliance with those contract provisions. Waiver of a writing requirement may be established by pre-senting evidence the parties agreed to the changes and the changes were completed. *Winn–Senter Const. v. Katie Franks, Inc.,* 816 S.W.2d 943, 945–46 (Mo.App.1991). Here, the parties established a practice of communicating changes or additions to the contract informally. Problems with this property became evident early on. Whenever a problem arose, Gilmartin informed the Kerns of it and discussed with them their options. Variations and price changes from the original contract were done through mutual agreement, without a formal written order. Although some changes to the contract were handwritten in and initialed, neither party followed the contract provisions strictly. Gilmartin orally informed the Kerns of necessary changes and extra work. Likewise, the Kerns informed Gilmartin when they wanted certain items added or omitted from the original plans, including the addition of selected extras. Though the contract provision specified that additions or changes were to be approved by the parties in writing, neither party complied or requested strict compliance with the contract.

The Kerns argue Gilmartin should be held to strict performance because of their unique relationship. James Gilmartin, the president of Gilmartin Brothers, Inc., was the stockbroker for the Kerns and advised them on investments in the years preceding the residential sale contract. The Kerns maintain that because of the fiduciary relationship in their previous dealings with James Gilmartin and his knowledge of their financial situation, he and his company should be held to strict compliance with the contract. The law, however, does not recognize such a principle. The fact a party to a contract is privy to certain financial or personal information, absent more, does not serve to heighten his obligation under a contract or require that party to strictly adhere to the contract terms.[3]

Having found the parties waived strict compliance, the key issue to resolve is whether the contract was properly rescinded by the Kerns or whether it remained in full

3. The Kerns did submit a claim for misrepresentation which was decided against them. The Kerns do not raise any claim of error on that ruling and cannot attempt to interpose such an argument now.

force and effect. In answering that question we are not limited to only the contract itself but must also take into consideration the circumstances surrounding the parties' actions.

The Kerns contend they effectively rescinded the contract even though they did not strictly comply with the contract's provisions. A party seeking to rescind, however, must act promptly upon discovering the reason and need to rescind. *Sheinbein v. First Boston Corp.*, 670 S.W.2d 872, 877 (Mo.App.1984). The rescinding party must act before the other party is placed in a position where he would be prejudiced by a rescission. *Id.* In deciding whether rescission was timely, the court must consider whether the non-rescinding party has been placed in a disadvantaged position by the delay. *Iota Management v. Boulevard Inv. Co.*, 731 S.W.2d 399, 416 (Mo.App.1987).

In the case at bar, without deciding whether the Kerns' attorney's letter constituted proper notice, the notice of rescission was not timely given. The parties learned of difficulties with the property just two weeks after the contract was executed. At that point the contract price was increased. Thereafter, the Kerns selected certain extras for the house. When excavation started a month later, the construction crew realized more work was needed due to rock. Then, when construction was almost complete, the staff installing the sewer encountered more rock, requiring additional labor and machinery. Three separate work authorizations were issued in the month of January 1992. All the while the Kerns were present at the site at least three or four days a week. Gilmartin, the general contractor, and the Kerns communicated frequently. The Kerns were aware of the extra work and acquiesced to the changes. Mr. Kerns testified he knew of the rock clause in the contract in September of 1991 when they started construction. There was also evidence in the record that

the Kerns were told of their option to cancel. Yet, it was not until February 25th, two days before the date of closing, that the Kerns attempted to rescind the contract. In the letter sent to Gilmartin the attorney for the Kerns cited as reasons for the rescission the problems with the rock during excavation and the problems with the sewer hookup. The Kerns' testimony at trial also focused on these problems as reasons to rescind and, in addition, noted their overall disappointment with the house, especially the fact it had stairs when they originally requested none. The change in plans adding the steps came after the crew hit rock during the excavation back in September 1991 and was done with full disclosure to the Kerns. Meanwhile, Gilmartin continued with construction, even adding additional amenities as requested by the Kerns.

The Kerns' attempt to rescind the contract was untimely under the circumstances thus placing Gilmartin in a disadvantaged position by the delay. We find the judgment in Gilmartin's favor is not against the weight of the evidence and find no error of law. Point denied.

In their second point, the Kerns claim error in the trial court's judgment against them on their counterclaim for all amounts paid under the contract, including the $15,000.00 earnest deposit. This point, however, is contingent upon a finding by this court that the Kerns properly rescinded the contract and would be entitled to damages therefor. As discussed above, we find the contract was not properly rescinded and, therefore, the court did not err in rendering judgment against them.[4]

The Kerns' third point of contention challenges the court's calculation of damages. The Kerns argue the court erred in including $15,687.00 in additional sewer and rock charges. The Kerns assert they should not be responsible for that increase in the contract price because Gilmartin did not present

---

4. We note, however, that the sale contract contained the following handwritten notation: "Earnest deposit is non-refundable and will be credited toward cost of lot and home." Handwritten provisions of a contract are to prevail over printed portion if the two are in conflict. *Burst v.*

*R.W. Beal & Co.*, 771 S.W.2d 87, 89–90 (Mo.App. 1989). In the court's calculation of damages it did credit the $15,000.00 toward the contract price of the home, which we find proper under the contract.

the price increase in accordance with paragraph 4 of the contract. As discussed earlier in this opinion, paragraph 4 states that if rock is found upon excavation or there is an increase in the contract price, the contract price may be increased by notifying buyers by certified mail of the amount of the increase. The paragraph goes further to provide that if buyers disapprove of the price increase, they may cancel the contract by sending notice to that effect by certified mail within ten days. Because Gilmartin delivered the price increase by hand and not by certified mail, the Kerns claim Gilmartin did not comply with the contract and therefore could not serve as proper notice of a price increase. The Kerns furthermore argue that performance under the option provision of the contract was a condition precedent to their acceptance of an increase. Because Gilmartin did not satisfy that provision and therefore never performed the condition precedent, the Kerns' opportunity to accept or deny the price increase was never triggered. This point is made irrespective of the fact that the Kerns did indeed reply to the price increase past the ten day limit by courier instead of by certified mail.

As discussed more fully above, although the contract does specify that price increases should be made in writing, by certified mail and with ten days to respond, we do not hold the parties to strict compliance. We believe that the actions of the parties suggest a mutual waiver of the aforementioned requirements. Neither party fully complied with the contract provisions and the consequence, if any, of their technical failure to comply was de minimus. That being the case, Gilmartin did appropriately submit its list of price increases to the Kerns. The Kerns do not challenge any other item on the list or the requested amounts due other than the request of $15,687.00 for extra sewer and rock. The Kerns do not even challenge the reasonableness of the amount. Rather, the Kerns argue altogether that they should not be the ones responsible for the increase in sewer and excavation costs but that Gilmartin, as the builder, should bear that cost.

In light of the actions of these parties and the communications had between them con-

cerning the problems encountered with the property, we are led to conclude that the Kerns acquiesced to the additional work and costs associated with the sewer and rock excavation and, therefore, must pay the reasonable amount therefor. Whenever the need for additional work arose, Gilmartin advised Kerns of the problem and their options. Though specific amounts were not discussed, the parties did mutually resolve the situation and modified their plans and the construction accordingly.

The Kerns also argue that the sewer charges included in the $15,687.00 figure were, in their opinion, not "extras" but were part of the initial contract. Our reading of the record, however, leads us to the opposite conclusion. The determination of whether an item or activity is an "extra" and not something already contemplated under the contract, is a question for the finder of fact. *See Meadows v. Kinser*, 603 S.W.2d 624, 626 (Mo.App.1980). As a court-tried matter we accept as true the evidence and reasonable inferences therefrom in favor of the prevailing party and disregard the contrary evidence. *Hart & Son Hauling, Inc. v. MacHaffie*, 706 S.W.2d 586, 587 (Mo.App. 1986).

James Gilmartin testified concerning the inability to know the location and quantity of rock on a property. The initial contract price had been raised to accomodate the installation of the sewer main in the street and then increased again to take care of the rock excavation. In estimating the initial contract price, Mr. Gilmartin testified that builders typically only include the lateral hookup to the sewer system in their pricing. If there is a problem or there exists rock impeding excavation, then the cost is more, which is something undetectable until the actual digging takes place. In this particular case, that is just what happened.

To accomplish the necessary lateral hookup, and pursuant to MSD requirements, the sewer company required additional work authorizations which were issued on three separate occasions. An itemized list of costs for labor and materials was given to Gilmartin and later to the Kerns. We find no error in including the $15,687.00 amount in the calcu-

**332**

lation of damages and find substantial evidence to support it as an "extra" to the contract.

In their final point, the Kerns claim the court erred in calculating damages using the resale value of the home. The Kerns argue the resale price of $139,650.00, the gross sale price of the two bedroom house, should not have been used. Rather, the Kerns assert a higher resale value should have been used based on the price of a three bedroom home. The Kerns decided during construction of the home to modify the plans from a three bedroom home to a two bedroom house by removing a wall. The Kerns argue on appeal that Gilmartin had a duty to mitigate damages by adding the third bedroom at a minimal cost, which would have increased the market value of the home substantially. Due to Gilmartin's failure to mitigate damages, the Kerns assert the award should be calculated by using the amount they could have gotten at the sale as a three bedroom home, an estimated appraisal value of $160,000, which would yield a difference of $20,350.

■■■ We find no merit in the Kerns' assertion. The Kerns cite no authority for the proposition a builder or seller has a duty to mitigate damages in an action for breach of a construction contract, nor has our research encountered any. To the contrary, the law is well-settled that where the seller of real estate brings suit for breach of contract against the buyer, the appropriate measure of damages is the difference between the contract price and the market value of the property on the date the sale should have been completed. *Hawkins v. Foster*, 897 S.W.2d 80, 86–87 (Mo.App.1995); *Hoelscher v. Schenewerk*, 804 S.W.2d 828, 832 (Mo.App. 1991); *Conway v. Judd*, 723 S.W.2d 905, 909 (Mo.App.1987); *Leonard v. American Walnut Co.*, 609 S.W.2d 452, 455 (Mo.App.1980). *See also* 92 C.J.S. *Vendor & Purchaser* § 537(c)(1) (1955). Upon breach, the seller may resell the property or keep the property and, with either choice, the seller is entitled to recover the difference between the contract price and the market price. *Leonard*, 609 S.W.2d at 455. If the seller decides to resell within a reasonable time after breach, the price obtained is some evidence of the market value. *Id.* There is no obligation on the part of the seller, however, to mitigate damages. *Id.*

■■ Here, the contract price was $157,000.00. In August of 1992, some six months after breach, Gilmartin resold the house for $139,650.00. This amount served as evidence of the market value of the property to be used by the court in calculating damages. The Kerns did not present any evidence of the market value of the property as built, i.e. as a two bedroom home, but instead rely on estimates for a three bedroom home as initially designed. They have therefore failed to show how the amount calculated by the court as the market value is unsupported by substantial evidence.

■■ The Kerns go a step further and propose this court recognize an affirmative duty on the part of sellers to improve the subject property if such improvements can be achieved at minimal cost. We decline. This court has never imposed such a duty absent some allegation of a defective condition, nor do we feel it appropriate to create one now. The seller of property, upon breach by the buyer, may choose to mitigate damages by reselling the property within a reasonable time, but the seller is by no means required to or obligated to install fixtures or add improvements to increase the overall market value of the property. This is especially true where, as was the case here, the buyers changed the design of the house on their own choosing knowing full well the value of the home would be decreased. Point four is denied.

The judgment of the trial court is affirmed.

SMITH, P.J., and GARY M. GAERTNER, J., concur.